UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

CMS GAS TRANSMISSION COMPANY,          :
                                       :          08 Civ. 3169 (LAP)
                    Petitioner,        :
                                       :
        - against –                    :
                                       :
THE REPUBLIC OF ARGENTINA,             :
                                       :
                    Respondent.        :
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ATTACHMENT AND TEMPORARY RESTRAINING ORDER

Petitioner CMS Gas Transmission Company ("CMS") submits this reply brief in support of its motion and application, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure ("FRCP") and Section 6210 of the New York Civil Practice Law and Rules (the "CPLR"), for an order attaching certain property of Respondent the Republic of Argentina and a temporary restraining order.

### PRELIMINARY STATEMENT

This court should grant the attachment order. Pursuant to 22 U.S.C. §1650a, CMS has the status of a judgment creditor against the Republic of Argentina ("Argentina") by virtue of its receipt of a favorable award against Argentina (the "Award") in an arbitration conducted under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID"). However, Argentina has refused to pay the award for a period in excess of six months – cynically maintaining that CMS must now sue Argentina in the Argentine courts to obtain payment. *See* Ex. 1.

In Argentina's efforts to evade enforcement of the Award, Argentina enjoys no sovereign immunity. Moreover, the indisputably commercial assets that have been attached belong either to Argentina's alter ego, the Banco de la Nación Argentina

("BNA") or its subdivision, the Province of Santa Cruz, both of which are equally responsible for this obligation of the Republic under Argentine law.

In response to CMS's application, Argentina raises only two (meritless) defenses: *First,* Argentina claims that CMS failed to specify the assets it seeks to attach, in violation of the Foreign Sovereign Immunities Act. This argument is belied by the very brief filed by Argentina, which discusses at length the very assets CMS has attached. *Second,* Argentina argues that the assets in question do not belong to Argentina. However, as noted below, this argument ignores the essential nature of the BNA as an arm of the Argentine state and its alter ego and Santa Cruz as a political subdivision of Argentina. As such, the assets are Argentine commercial assets that may be used to satisfy Argentina's treaty obligation to pay the Award.

## ARGUMENT

## I.    ARGENTINA ENJOYS NO SOVEREIGN IMMUNITY IN THIS PROCEEDING

Argentina initially claims that CMS's motion fails because it does not identify specific property of Argentina. However, it is clear from CMS's papers and the exhibits submitted therewith that specific and discrete property is identified: the assets of BNA, including a bank account containing funds owned by the Province of Santa Cruz and used for investment purposes by the Province. Indeed, Argentina's assertion that the "unidentified" funds are owned by Santa Cruz forms the gravamen of its brief.

As a result, Argentina's reliance on *Olympic Chartering, S.A. v. Ministry of Industry and Trade of Jordan*, 134 F.Supp.2d 528 (S.D.N.Y. 2001) is misguided. While the Court in *Olympic Chartering* addressed a judgment creditor's efforts to attach a judgment debtor's assets "wherever the same may be located," *Id.* at 536, this case

involves CMS's prompt action upon learning that Argentine commercial assets would be located in the Southern District of New York.  As stated in Petitioner's Brief at pages 7 and 8, CMS learned of particular funds that Argentina intended to transfer to New York last week.  In an effort to capture those funds and ensure that Argentina complies with its international obligations, CMS secured the Temporary Restraining Order.[1]

Additionally, an exception to sovereign immunity applies in this case.  28 U.S.C. §1610(a) provides that:

> The property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if --
>
> (6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement.

In this case, the property at issue – investment funds – is clearly commercial.  *See* Petitioner's Br. at 7-8.  Additionally, federal law, consistent with ICSID Convention Article 54, provides that:

> An award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.

---

[1]    In any event, in enforcing arbitral awards this Court has approved even broader language in the past, providing that an award creditor may commence execution proceedings "against the Congo and any assets, revenues or properties of the Congo used for a commercial activity in the United States."  *See* Ex. 11, Order Granting Motion to Execute on Judgment, *FG Hemisphere Associates v. Republic of Congo*, 01 CIV 8700 (S.D.N.Y. Sept. 5, 2002).

22 U.S.C. §1650a.

The assets at issue fall within the exception in §1610(a)(6), because the Award carries the same weight as a judgment of the New York Supreme Court. In other words, pursuant to ICSID Convention Article 54 and 22 U.S.C. §1650a, an ICSID award is *automatically* enforceable by this Court. Fitting squarely within the exception to sovereign immunity discussed above, the assets at issue are not immune.[2]

## II.    THE ASSETS OF THE BNA AND SANTA CRUZ MAY BE USED TO SATISFY THE AWARD

### A.    The BNA Assets May Be Attached

All of the assets that have been attached are in the possession of the BNA, a bank owned entirely by Argentina that operates as Argentina's financial agent for all commercial purposes. *See* Exhibit D to Petitioner's Br. However, state-owned entities do not enjoy separate legal status from the state when: (*i*) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (*ii*) recognition of the corporate status "would work fraud or injustice" on the other party. *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) ("*Bancec*"). Here, both exceptions apply.

#### 1.    BNA Is Argentina's Alter Ego

As set forth in BNA's governing law and charter, the bank's role is akin to that of a ministry, an arm of the government implementing government economic and commercial

---

[2]    We note also that since over six months have passed since ICSID's issuance of its annulment decision, *see* Exhibit B to Petitioner's Br., it is clear that a "reasonable period of time has elapsed" under 28 U.S.C. §1610(c), thus permitting the attachment. *See* Ex. 11 (finding 30 days to be a "reasonable" period of time under §1610(c)).

policy, rather than a corporation.    It is Argentina's alter ego, and thus falls under the

*Bancec* principal/agent exception:

- *First,* as explained in BNA's Articles of Incorporation, the bank "will coordinate its action with the financial and economic policies that are established by the National Government."[3]

- *Second*, as described on the BNA website, "constituted entirely with state capital . . . its principal objective is to execute the function of financial agent of the Federal Government and, as such, to receive official deposits and make payments for the account and upon order of the Nation."    *See* Petitioner's Br., Ex. D.    In other words, the fundamental role of BNA is not to earn profits as would a corporation, but rather to promote the economic policies of Argentina.

- *Third*, Argentina is intimately involved in many aspects of the bank's operations. For example, after the Argentine Central Bank certifies BNA's financial report, BNA is required to submit this report to the National Executive, *see* Ex. 2, Art. 6; the National Executive appoints directly the President and Vice President of BNA and may also replace them, *Id.*, Art. 9-11; the Board of Directors of the bank, after approving the annual budget, must submit it to the National Executive, *Id.*, Art. 15; the bank must submit short- and medium-term development plans to the Economy Minister, *Id.*, Art. 16; the bank's compliance with its Articles of Incorporation are overseen by a trustee appointed by the National Executive, *Id.*, Art. 21; the bank may participate in international consortia, establish other banks, promote the formation of consortia to promote Argentine exports, or sell shares in such operations <u>only</u> with the prior authorization of the Central Bank and express approval of the Economy Minister, *Id.*, Art. 24; and finally, the salaries of top officials are set by the National Executive. *Id.*, Art. 31.

Based on the foregoing, Argentina's extensive involvement in BNA's operations rises to

the level of a principal/agent or alter ego relationship.

### 2.    Recognition Of Distinct Legal Status Between BNA And Argentina "Would Work Fraud Or Injustice."

Recognition of a distinct legal status between BNA and Argentina would also

enable Argentina to avoid its international obligations to pay the CMS Award.    As such,

---

[3]    Ex. 2, Carta Organica, Law 21,799, Annex A, Art. 1 (Spanish original: "Coordinará su acción con las políticas económico-financieras que establezca el gobierno nacional.").

it would "work fraud or injustice" and thereby meet the *Bancec* standard for disregarding a formal distinction between the two entities.

The facts of *Bancec* itself are almost directly on point:  Bancec was a Cuban government-owned bank utilized by the government in foreign trade attempting to collect on a letter of credit from First National City Bank (now Citibank) in a U.S. court. Citibank claimed a setoff based upon the Cuban expropriation of its assets, which was effected by Banco Nacional (the Cuban National Bank) and the Cuban government.  *Id.* at 615-16.  Despite the fact that Bancec itself had not participated in the expropriation, the Supreme Court refused to recognize the separate legal status of Bancec, Banco Nacional and the Cuban Government.  *Id.* at 633.  Cuba could not "reap the benefits of our courts while avoiding the obligations of international law." *Id.* at 634.  Thus, the Court "decline[d] to adhere blindly to the corporate form when doing so would cause such an injustice," and permitted the setoff. *Id.* at 632.

Similarly, Argentina has taken advantage of the U.S. financial system by transferring commercial dollar-denominated investment accounts into New York. Meanwhile, Argentina seeks to avoid its international obligations – obligations that it owes to over 140 countries that have ratified the ICSID Convention, but more particularly to the United States.  As in *Bancec*, this Court should not permit Argentina to "reap the benefits of our courts while avoiding the obligations of international law." *Id.*

**B.    The Province Of Santa Cruz Is Equally Bound To Comply With Argentina's Treaty Obligation To Pay The Award**

In an attempt to evade its responsibilities under the ICSID Convention and the US/Argentina BIT, Argentina also manufactures a fallacious legal separation between the Republic of Argentina on the one hand, and the Province of Santa Cruz on the other.

However, the "Republic of Argentina" – the party against which the Award was rendered, and against which these proceedings are brought – refers to a broader juridical concept than the federal government of Argentina. *See* Ex. 3 (*Preliminary Opinion of Professor Alberto B. Bianchi*).

The "Republic of Argentina" is made up of *both* the federal government *plus* the provincial and local governments. And both are bound by the obligations in the US/Argentina BIT, including the obligation to satisfy the Award. *See id; see also Compagnie Noga D'Impotation et D'Exportation S.A. v. The Russian Federation*, 361 F.3d 676, 686-88 (2d Cir. 2004) (an internal separation between a sovereign and a political organ was of "no legal significance").

It is beyond cavil that Argentina has an obligation under the US/Argentina BIT and the ICSID Convention to pay the Award. US/Argentina BIT, Art VII(6); ICSID Convention, Art. 53(1); Art. 54(1). Under well-established law, and contrary to Respondent's unsupported assertions (*see* Respondent's Br. at 4), international obligations entered into by a federal government *are* binding on its constituent states or provinces. *See U.S. v. Belmont*, 301 U.S. 324, 331 (1937) (recognizing that all international agreements entered into by the United States of America are fully binding on the states: "[i]n respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the state of New York does not exist."); *U.S. v. Pink*, 315 U.S. 203, 233-34 (1942); *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924).

Accordingly, there is no merit to the suggestion that Argentina can somehow evade its treaty obligations by acting through convenient political subdivisions, such as

the Province.   It is improper to insulate the Province from liability for Argentina's wrongful acts and continued refusal to pay given (*i*) that the Province is equally bound by Argentina's relevant obligations and duties under the US/Argentina BIT and the ICSID Convention, and (*ii*) that the Republic of Argentina, the named party in the Award and in this action, is an amalgamation of the federal government and the provincial and local governments, including the Province of Santa Cruz.[4]

## III.   ARGENTINA MAY HAVE ALREADY BREACHED THE TEMPORARY RESTRAINING ORDER AND ORDER OF ATTACHMENT

The principal funds sought to be attached by CMS have recently been the subject of conflicting reports in Argentina.   According to one report, the account is now under the administration of BNA pending repatriation. *See* Ex. 7.   If this is the case, continuation of CMS's attachment and temporary restraining order is essential to ensure that the funds do not disappear forever.

According to recent conflicting press reports, however, the Governor of Santa Cruz has announced that over US$554 million was repatriated from Switzerland to Argentina last Friday (while the Order was in place) with the assistance of BNA New

---

[4]   It is clear that the ownership interest of Santa Cruz in the funds is only at the formal level, and that the Republic of Argentina is intimately involved in and directs decisions relating to the use, administration and movement of the funds.  *See* Ex. 4 ("the Banco Central has also participated in the routing of the money together with the highest authorities of the Banco Nación.  We will analyze with them the different financial alternatives next week . . ."); Ex. 5 ("[Governor Peralta of Santa Cruz] said that he had agreed with the Kirchner's [National President Cristina Kirchner and her husband former National President Nestor Kirchner] what to do with this money…On the other hand, it was agreed [between the Governor and the President], to change the administration of the trust from the Banco Santa Cruz to the Banco Nacion."); Ex. 6 ("The Governor of Santa Cruz, Daniel Peralta, admitted tonight that the announced return of the funds that the Province has deposited in a Swiss bank 'was agreed' with former president Nestor Kirchner and his wife, the current President, Cristina Fernandez.").

York's general manager, Patricio Suarez Buyo and is now deposited in Argentina in accounts of the BNA. *See* Ex. 8; Ex. 9. Indeed, the Governor of Santa Cruz is reported to have claimed that "*They [Petitioners] fell for the trick*" in seeking to attach funds in New York, because the funds were brought directly from Switzerland to Argentina last Friday, March 28, 2008 (in violation of the Order). *See* Ex. 8.

If this is in fact the case, Argentina and BNA have blatantly disregarded and breached the Temporary Restraining Order and Order of Attachment, which prevented BNA and other persons holding accounts of Argentina from "transferring, removing or moving the Funds" and requires those holding accounts of Argentina to "promptly notify this Court . . . of any attempts by Argentina to move, transfer, withdraw, or otherwise pay, disburse or dissipate the Funds in any manner" (*See* Ex. 10) because no electronic fund transfer of US dollars could have been performed between Switzerland and Argentina without the involvement of correspondent accounts here in New York at the BNA.[5] *See, e.g., Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 273 (2d Cir. 2002) (Every ETF involves at least two separate transfers: one from the sending party (here, Credit Suisse in Switzerland) to the intermediary bank (here, BNA in New York), and a second from the intermediary bank (BNA) to the receiving party (here, Argentina)).

Accordingly, even if Argentina attempted to bypass the U.S., the funds repatriated to Argentina in U.S. dollars must have passed through the U.S., thereby violating the order of attachment and the TRO. Contrary to the requirements set out in the order of attachment and TRO, Petitioner has not been informed of any attempts by Argentina to

---

[5] *See* Ex. 12 at 3 ("in order for Credit Suisse to be able to transfer the money, it must be sent in US dollars to the correspondent bank of Banco de la Nación Argentina, which, in this case was to be the New York branch of the Argentine bank.").

"move, transfer, withdraw, or otherwise pay, disburse or dissipate the Funds in any manner," nor has it been informed by BNA of the balances of any accounts held by Argentina. *See* Ex. 10.

Given the confusion surrounding the location of the funds, attorneys for CMS have today issued subpoenas to Credit Suisse, BNA and Argentina in order to ascertain the whereabouts of the funds.[6]  Petitioner respectfully requests that the Court extend the temporary restraining order and order of attachment until Petitioners learn of the whereabouts of the funds.

## CONCLUSION

For the foregoing reasons, the Court should grant CMS's motion for an order of attachment and application for a temporary restraining order.

Dated:       New York, New York
             April 2, 2008

                              Freshfields Bruckhaus Deringer, LLP

                              By: _____

Of Counsel:

Alexander A. Yanos            520 Madison Avenue
                              New York, NY 10022

                              *Attorneys for Petitioner CMS Gas
                              Transmission Company*

---

[6]  *See* Ex. 13.  Because CMS is judgment creditor, pursuant to Rule 69(a)(2) of the FRCP it can issue subpoenas pursuant to CPLR Rule 5223 seeking information relevant to the satisfaction of the judgment.

# EXHIBIT 1



**CMS ENERGY**

*Gas Transmission*

---

January 14, 2008

Mrs. Cristina Fernández de Kirchner
President of the Argentine Republic

Re: Payment of Award: *CMS Gas Transmission Co. v Argentine Republic* (ICSID Case ARB/01/8)

Dear Madame President:

We are in receipt of the enclosed letter dated December 6, 2007 from Mr. Osvaldo Gugliemino, Procurador del Tesoro de la Nación. Mr. Guglielmino's letter responds to our November 14, 2007 letter to Former President Kirchner, being the latest in a series of correspondence with the Republic of Argentina in which we have requested payment of the Award issued in the above arbitration.

With respect, Mr. Guglielmino is incorrect in asserting that Article 54 of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the *ICSID Convention*) requires CMS to obtain a decision of a court in the Republic of Argentina in order for the Republic to be obliged to comply with the Award.

The Republic's obligation immediately to comply with the Award, now final and not subject to any further proceeding, is independent of CMS's right to enforce it before local courts in Argentina or elsewhere. Nothing in Article 54 derogates from the Republic's obligation under Article 53 to comply with the award by immediately paying the amount due to CMS. As explained by Aron Broches, the "father" of ICSID and first Secretary-General:

> Article 53 is the primary provision and . . . while Article 54 is important, concern with the possibilities offered by that provision should not be permitted to obscure or weaken the importance of Article 53. The obligation of governments to abide by awards remains unaffected by the limitations on their forcible execution.[1]

---

[1] Aron Broches, Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution, 2 ICSID Review – F.I.L.J. 287, 302 (1987). See also Christoph H. Schreuer, The ICSID Convention: A Commentary 53:30 (2001):

*One Energy Plaza • Jackson, MI 49201 • Tel: 517 788-0550 • Fax 517-788-0113 • www.cmsenergy.com*

Article 53 of the ICSID Convention creates an absolute obligation on the Republic to comply with the Award by paying CMS:

> The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed.[2]

The binding nature of ICSID awards was emphasized and undisputed during the drafting of the ICSID Convention.[3]

By not complying with the Award, as ordered by the Arbitral Tribunal and the Annulment Committee, the Republic has not only breached its obligations toward CMS under the Argentina-US Bilateral Investment Treaty and the ICSID Convention, but also its obligations to the United States and the more than 150 other States party to the ICSID Convention.

For these reasons, CMS respectfully reiterates its request that the Republic abide by and comply with the terms of the Award by paying the amount owed to CMS without further delay. The current amount due is US$168,269,083.

Sincerely,

Thomas L. Miller

---

The obligation to comply [expressed in Article 53] is independent of any procedural obstacles that may arise in the course of enforcement. Art. 54 refers to the law of the State in which recognition is sought. But any difficulties that may arise under that law in no way affect the obligation of a party to comply with the award. Therefore, a party that successfully resists enforcement of an award before a court . . . is in violation of its obligation under Art. 53.

[2] ICSID Convention, Article 53. See also Report of the Executive Directors on the ICSID Convention, ¶¶41-42 ("Article 53 declares that the parties are bound by the award and that it shall not be subject to appeal or to any other remedy except those provided for in the Convention . . . [namely,] revision . . . and annulment. . . . [T]he parties are obliged to abide by and comply with the award . . . .") and ¶37 (describing the aim of arbitration as the "binding determination of the dispute by the Tribunal"). Article 26 of the Convention expresses the exclusive remedy rule in more general terms: "Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy."

[3] Schreuer at 53:10 ("The principle of the binding force of an award found expression in all drafts leading to the Convention and was never cast into doubt in the debates on these drafts. Rather, the award's binding force was emphasized on numerous occasions" (citations omitted).). See also *ibid*, 53:12; Broches at 291-294.

Enclosure

Copies (by courier):    Secretary of State of the United States of America,
                        Dr. Condoleezza Rice

                        Minister of Foreign Affairs, International Commerce and Religion,
                        Republic of Argentina,
                        Lic. Jorge Enrique Taiana

                        Assistant Secretary for Economic, Energy and Business Affairs, United
                        States Department of State,
                        Mr. Daniel A. Sullivan

                        Procurador del Tesoro de la Nación, Republic of Argentina,
                        Mr. Osvaldo César Guglielmino

                        Ambassador of the United States of America to the Republic of
                        Argentina,
                        Mr. Earl Anthony Wayne

                        President of the World Bank and the ICSID Administrative Council,
                        Mr. Robert B. Zoellick

                        Secretary-General of ICSID,
                        Ms. Ana Palacio

# EXHIBIT 2

**English Translation, Relevant Articles of Annex A to Law 21,799**

**Article 1.-** . . . The bank will coordinate its action with the financial and economic policies that are established by the National Government.

**Article 6.-** . . . The Bank is able to make aware the National Executive its balance sheet and income statement and it will publish them within 10 working days following their certification by the Central Bank of the Argentine Republic.

**Article 10.-** . . . [The President and Vice President] will be designated by the National Executive and will be in office for four years . . . .

**Article 11.-** If the President or Vice President dies or resigns . . . the National Executive will designate their replacements . . . .

**Article 15.-** . . . (k) The balance sheet, income statement and annual report of the Bank will be approved annually, all of which will be sent to the National Executive for its knowledge and for publication . . . .

**Article 16.-** Annually . . . the Board of Directors . . . shall approve the short-term and medium-term action plan for the development of the Bank . . . . This plan shall be submitted to the Economy Minister.

**Article 21.-** The observance by the Bank of the dispositions of this Organic Letter and other laws, decrees, resolutions and dispositions that are applicable, will be supervised by a trustee designated by the National Executive.

**Article 24.** – (f) Constituting, promoting or participating in the formation or establishment of banks, consortia or international bank organizations . . . [shall be done] through the prior authorization of the Central Bank of the Argentine Republic and express approval of the Economy Minister . . . .

(g) Promoting the formation of consortia that have the objective of developing and promoting Argentine exports . . . [shall be done] through the prior opinion of the Central Bank of the Argentine Republic and express authorization of the Economy Minister.

(h) Promoting the formation of foreign firms for the purpose of facilitating exports of goods, services and Argentine technology, in which it can participate through the prior opinion of the Central Bank of the Argentine Republic and express authorization of the Economy Minister.

**Article 31.-** The salaries of the President, Vice President, Boards of Directors and Trustee will be fixed by the National Executive.

**BANCO DE LA NACION ARGENTINA.**

**Ley 21.799 con sus modificaciones.**

**Carta Orgánica de la citada entidad**

Bs. As. 18/5/1978

B.O. 16/6/1978

En uso de las atribuciones conferidas por el artículo 5 del Estatuto para el Proceso de Reorganización Nacional,

EL PRESIDENTE DE LA NACION ARGENTINA SANCIONA Y PROMULGA CON FUERZA DE LEY:

**Artículo 1.-** Apruébase la Carta Orgánica del BANCO DE LA NACION ARGENTINA que obra en anexo y que es parte integrante de la presente ley.

**Artículo 2** - Los depósitos judiciales de los Tribunales Nacionales en todo el país deberán hacerse en el Banco de la Nación Argentina, excepto en jurisdicción de la Capital Federal donde únicamente se depositarán los que al respecto determine la ley que rija en esa materia. También deberán depositarse en el Banco de la Nación Argentina los fondos en moneda extranjera de los organismos del Estado Nacional, así como de las entidades o empresas que pertenezcan total o mayoritariamente al mismo, que transfieran al exterior o los mantengan depositados en él, cuando las casas del Banco ya instaladas o que se instalen fuera del país puedan prestar el respectivo servicio.

**Artículo 3**.- Derógase la ley 21351

**Artículo 4** - Comuníquese, dése a la Dirección Nacional del Registro Oficial y archívese.

**FIRMANTES**

VIDELA.

**Anexo A: BANCOS-BANCO DE LA NACION ARGENTINA-**

CAPITULO I

NATURALEZA Y OBJETO

**Artículo 1** - El Banco de la Nación Argentina es una entidad autárquica del Estado, con autonomía presupuestaria y administrativa. Se rige por las disposiciones de la Ley de Entidades Financieras, de la presente ley y demás normas legales concordantes. Coordinará su acción con las políticas económico-financieras que establezca el gobierno nacional.

No le serán de aplicación las normas dispuestas con carácter general para la organización y funcionamiento de la administración pública nacional, en particular los actos de los cuales resulten limitaciones a la capacidad de obrar o facultades que le confiere su régimen específico.

*(Sustituido por art. 1 de la Ley N° 25.299 B.O. 7/9/2000, Promulgada Parcialmente: Septiembre 4 de 2000.)*

**Artículo 2** - La Nación Argentina garantiza las operaciones del Banco.

**Artículo 3** - El Banco tendrá por objeto primordial prestar asistencia financiera a las micro,

pequeñas y medianas empresas, cualquiera fuere la actividad económica en la que actúen. En tal sentido deberá:

a) Apoyar la producción agropecuaria, promoviendo su eficiente desenvolvimiento;

b) Facilitar el establecimiento y arraigo del productor rural y, sujeto a las prioridades de las líneas de crédito disponibles, su acceso a la propiedad de la tierra;

c) Financiar la eficiente transformación de la producción agropecuaria y su comercialización en todas sus etapas;

d) Promover y apoyar el comercio con el exterior y, especialmente, estimular las exportaciones de bienes, servicios y tecnología argentina, realizando todos los actos que permitan lograr un crecimiento de dicho comercio;

e) Atender las necesidades del comercio, industria, minería, turismo, cooperativas, servicios y demás actividades económicas;

f) Promover un equilibrado desarrollo regional, teniendo en consideración el espíritu del artículo 75 de la Constitución Nacional.

Para lograr estos objetivos -excepto las operaciones contempladas en el artículo 25 de esta carta orgánica, las de financiamiento de exportaciones y las operaciones interbancarias o bursátiles de corto plazo- el Banco de la Nación Argentina no podrá otorgar préstamos superiores a:

I. Pesos cinco millones ($ 5.000.000), si la empresa solicitante tiene pasivos en otros bancos y la participación del Banco de la Nación Argentina no es superior al cincuenta por ciento (50%) del total del pasivo.

II. Pesos un millón ($ 1.000.000), si el Banco de la Nación Argentina es el único prestamista.

El directorio del Banco de la Nación Argentina queda facultado para considerar excepciones a los montos indicados previa intervención de dos (2) calificadoras de riesgo de primera línea y definirá la calificación mínima aceptable que se fijará como política general. Asimismo el banco podrá:

g) Administrar fondos de jubilaciones y pensiones y ejercer la actividad aseguradora a través de la constitución o participación en otras sociedades, dando cumplimiento en lo pertinente a la ley 20.091 y sus modificaciones sometiéndose a su organismo de control;

h) Otorgar créditos para la adquisición, construcción o refacción de viviendas;

i) Participar en la constitución y administración de fideicomisos y en las restantes operaciones que autoriza la Ley de Entidades Financieras.

*(Modificado por art. 40 de la Ley 24.241 B.O. 18/10/1993)*

*(Sustituido por art. 2 de la Ley N° 25.299 B.O. 7/9/2000, Promulgada Parcialmente: Septiembre 4 de 2000.)*

CAPITULO II

CAPITAL Y UTILIDADES

**Artículo 4** - El capital del Banco asciende a SESENTA MIL MILLONES DE PESOS ($ 60.000.000.000), el que podrá ser incrementado por el Directorio mediante la capitalización de las utilidades y reservas que destine a tal objeto y de los revalúos contables que apruebe, como así también los recursos que para ello le asigne el Gobierno Nacional.

**Artículo 5º: De las utilidades líquidas y realizadas que resulten al cierre del ejercicio,**

una vez efectuada las amortizaciones y deducidos los castigos, previsiones y reservas que el Directorio juzgue convenientes, se destinarán:

a) El cincuenta por ciento (50%) a aumentar el capital del Banco.

b) El veinticinco por ciento (25%) a un fondo de subsidio para las tasas de interés de créditos destinados a micro, pequeñas y medianas empresas.

c) El veinticinco por ciento (25%) a un fondo de subsidio para las tasas de interés de créditos destinados a provincias o municipalidades.

Este artículo entra en vigencia a partir del ejercicio siguiente a la fecha de promulgación de la presente ley.

*(Sustituido por art. 5 de la Ley N° 25.299 B.O. 7/9/2000, Promulgada Parcialmente: Septiembre 4 de 2000; Observado por Decreto Nacional N° 775/2000 B.O. 7/9/2000)*

CAPITULO III

CUENTAS Y ESTADOS

**Artículo 6** - El ejercicio financiero del Banco será anual y se cerrará el 31 de diciembre. El Banco pondrá en conocimiento del Poder Ejecutivo Nacional su balance y cuenta de ganancias y pérdidas y los publicará dentro de los diez días hábiles siguientes a su certificación por el Banco Central de la República Argentina.

CAPITULO IV

DOMICILIO

**Artículo 7** - El domicilio legal del Banco es el de su Casa Central en la ciudad de Buenos Aires.

**Artículo 8** - El Banco puede crear o suprimir sucursales, agencias, delegaciones, oficinas y otras representaciones en el país y en el extranjero, con ajuste a lo previsto en la Ley de Entidades Financieras.

En los casos de apertura o cierre de agencias, delegaciones, oficinas u otro tipo de representaciones en el extranjero, deberá actuar con el previo conocimiento del Ministerio de Economía.

CAPITULO V

GOBIERNO

**Artículo 9** - El Banco estará gobernado por un Directorio compuesto por un Presidente, un Vicepresidente y diez Directores, todos los cuales deberán ser argentinos nativos o por opción, o naturalizados con no menos de diez años de ejercicio de la ciudadanía.

**Artículo 10** - El Presidente y Vicepresidente deberán ser personas de reconocida idoneidad en materia económica y financiera. Serán designados por el Poder Ejecutivo Nacional y durarán cuatro años en sus funciones, pudiendo ser nuevamente designados.

El Vicepresidente ejercerá las funciones del Presidente en caso de ausencia o impedimento de éste. Si el cargo quedara vacante, las cumplirá hasta tanto sea designado el titular. Además, desempeñará las funciones que, dentro de las que le son propias, el Presidente le delegare.

**Artículo 11** - Si el Presidente o el Vicepresidente fallecieren o renunciaren, o en alguna forma estuvieren impedidos o dejaren vacantes los cargos antes de cumplirse el período para el que fueron nombrados, el Poder Ejecutivo Nacional designará a los reemplazantes, de acuerdo con lo

dispuesto en el artículo 10, a los efectos de completar el período.

**Artículo 12** - Los Directores serán designados por el Poder Ejecutivo Nacional y deberán representar equilibradamente los distintos sectores, actividades y regiones que configuran el

quehacer económico nacional.

Durarán cuatro años en sus funciones y podrán ser nuevamente designados. Si alguno de ellos falleciere o renunciare, o en cualquier otra forma estuviere impedido o dejare vacante el cargo antes de cumplirse el período para el cual fue designado, se nombrará otra persona, de acuerdo con lo establecido en la presente Carta Orgánica, a los efectos de completar el período.

**Artículo 13** .- No podrán desempeñarse como miembros del Directorio:

a) Los alcanzados por las inhabilidades previstas en la Ley de Entidades Financieras o que carezcan de una reconocida solvencia moral.

b) Los que formen parte o dependan de la dirección, administración, representación o sindicatura de otros bancos o entidades financieras, excepto cuando por su condición de integrantes del Directorio del Banco de la Nación Argentina sean miembros natos de otras instituciones bancarias u organismos oficiales.

c) Los que tuvieran otros cargos o puestos, rentados o remunerados en cualquier forma, que dependiesen directa o indirectamente de los gobiernos nacional, provinciales o municipales. No se encuentran comprendidos en las disposiciones de este inciso quienes ejerzan la docencia.

d) Los que formen parte de cuerpos legislativos o judiciales, ya sean nacionales, provinciales o municipales.

**Artículo 14: PRESIDENTE** - El Presidente del Directorio del Banco ejerce la

representación legal de la Institución y dirige su administración.

Hará cumplir las disposiciones de esta Carta Orgánica y demás normas legales y reglamentarias cuya ejecución corresponda al Banco. Está autorizado para actuar y resolver en todos aquellos asuntos que no estén expresamente reservados a la decisión del Directorio. Al Presidente le corresponde:

a) Presidir las reuniones del Directorio.

b) Integrar las comisiones internas del Directorio con los miembros del mismo.

c) Proponer al Directorio la designación del Gerente General, Subgerentes Generales y Gerentes Departamentales del Banco.

d) Nombrar, trasladar, promover y sancionar a los funcionarios y empleados del Banco de acuerdo con las normas que dicte el Directorio, dándole posterior cuenta de las resoluciones adoptadas.

e) Proponer al Directorio la contratación de personal por tiempo determinado para la prestación o realización de servicios y excepcionalmente, para tareas ejecutivas o de asesoramiento.

f) Cuando existan razones de urgencia, podrá resolver en asuntos reservados al Directorio, conjuntamente con el Vicepresidente y un Director o con dos Directores, debiendo dar cuenta a dicho cuerpo en la primera sesión ordinaria que se celebre. De la misma facultad goza quien lo reemplace en el ejercicio de la Presidencia.

g) Asumir la representación de la Institución y otorgar los poderes necesarios para la representación legal del Banco.

**Artículo 15: DIRECTORIO** - Al Directorio le corresponde:

a) Establecer las normas para la gestión económica y financiera del Banco, decidir sobre las operaciones con la clientela y resolver los casos no previstos en dichas normas.

b) Determinar las modalidades y condiciones de las operaciones del Banco y fijar las tasas de intereses, descuentos, comisiones y plazos para esas operaciones.

c) *Derogado por Ley 22602.*

d) Establecer el régimen decontrataciones, subvenciones y donaciones a que se ajustará el Banco.

e) Establecer la organización funcional del Banco y dictar los reglamentos internos, así como también las normas administrativas y contables.

f) Crear y clausurar sucursales, agencias, delegaciones, oficinas y otras representaciones en el país y en el exterior con ajuste a lo establecido en el artículo 8.Establecer corresponsalías y designar corresponsales.

g) Dictar los estatutos, normas y condiciones de funcionamiento y operatividad de las filiales en el exterior, y el régimen de remuneraciones del personal argentino o extranjero que actúe en ellas, debiendo tener en cuenta, en lo pertinente, la legislación, modalidades bancarias y los usos y costumbres de cada país.

h) Establecer el plan de adquisición y venta bajo cualquier régimen de propiedad de los inmuebles necesarios para las operaciones inmobiliarias o la gestión del Banco, como también para su construcción o refección, afectándolos total o parcialmente para su uso y enajenando la parte no utilizada.

i) Fijar el régimen de adquisición de bienes en defensa de los créditos del Banco, de su reparación, conservación y enajenación

j) Fijar en cada ejercicio las amortizaciones, castigos, provisiones, previsiones, las sumas que se destinarán a aumentar el capital y a los demás fines, conforme a lo establecido en el artículo 5.

k) Aprobar anualmente el balance general del Banco, la cuenta de ganancias y pérdidas y la memoria, todo lo cual será elevado al Poder Ejecutivo Nacional para su conocimiento y dado a publicidad, en concordancia con lo señalado en el artículo 6. l) Nombrar al Gerente General, Subgerentes Generales y Gerentes Departamentales del Banco, a propuesta del Presidente.

ll) Aprobar la contratación de personal por tiempo determinado para la prestación o realización de servicios y excepcionalmente para tareas ejecutivas o de asesoramiento.

m) Aplicar sanciones de cesantía o exoneración a los funcionarios y empleados del Banco. Dictar el estatuto del personal del Banco, reglamentando todo lo atinente a las condiciones de su ingreso, estabilidad, retribución, promoción, prestación social y asistencial, capacitación, régimen disciplinario, licencias, incompatibilidades y separación.

n) Designar anualmente entre los Directores al Vicepresidente Segundo, quien reemplazará al Presidente o al Vicepresidente, según el caso.

Ñ) Designar directores, síndicos, fideicomisarios o auditores en las empresas o consorcios en que participe.

Las funciones mencionadas son meramente enunciativas y no impiden la ejecución de cualquier otro acto que haga a los fines de la Institución y al mejor cumplimiento de sus objetivos.

**Artículo 16** - Anualmente, a más tardar en la última reunión del Directorio que se celebre en el mes de noviembre, deberá quedar aprobado el plan de acción a corto y mediano plazo a desarrollar por el Banco a partir del siguiente ejercicio. Este plan deberá ser remitido al Ministerio

de Economía.

**Artículo 17** - El Presidente o quien lo reemplace, convocará a las reuniones del Directorio como mínimo dos veces al mes o cuando lo soliciten tres de sus miembros o el Síndico.

Seis miembros y el Presidente o quien lo reemplace, formarán quórum. En las reuniones las resoluciones serán adoptadas por simple mayoría de votos de los presentes, a excepción de aquellos asuntos que no cuenten con la aprobación previa de las instancias administrativas correspondientes, en cuyo caso se requerirá su aprobación por las dos terceras partes de los votos de los presentes.

En el supuesto de empate, quien ejerza la Presidencia tendrá doble voto. El voto es obligatorio para todos los miembros presentes del Directorio, salvo excusación fundada y aceptada por dicho cuerpo.

**Artículo 18** - Toda resolución del Directorio que infrinja el régimen legal del Banco, el régimen de entidades financieras o las disposiciones del Banco Central de la República Argentina hará responsables personal y solidariamente a sus miembros, a excepción de aquellos que hubieran hecho constar su voto negativo.

Igualmente serán responsables en la misma forma el Síndico y los miembros de la Gerencia General, cuando no hubiesen manifestado su oposición o disidencia en el acta de la sesión respectiva o mediante los informes a que hubiere lugar en el caso de no haber asistido.

CAPITULO VI

GERENCIA GENERAL

**Artículo 19** - La administración del Banco será ejercida por el Gerente General asistido por un Comité Gerencial integrado por los Subgerentes Generales.El Gerente General y los Subgerentes Generales deberán serargentinos, nativos o por opción, o naturalizados con no menos de diez años de ejercicio de la ciudadanía, poseer reconocida idoneidad en materia bancaria y económica, no hallarse comprendidos en las inhabilidades contempladas en al artículo 13 y no desempeñar otro cargo remunerado, salvo la docencia.

El Directorio designará, a propuesta del Presidente, el Subgerente General a quien le corresponderá desempeñar las funciones de Gerente General en caso de ausencia, impedimento o vacancia del cargo.

**Artículo 20** - El Gerente General y los Subgerentes Generales son los asesores inmediatos del Presidente, Vicepresidente y Directores. En ese carácter asistirán, en su caso, a las reuniones del Directorio. El Gerente General es responsable del cumplimiento de las normas, reglamentos y resoluciones del Directorio, para cuya aplicación podrá dictar las disposiciones que fueren necesarias.

CAPITULO VII

FISCALIZACION

**Artículo 21** - La observancia por parte del Banco de las disposiciones de esta Carta Orgánica y de las demás leyes, decretos, resoluciones y disposiciones que le sean aplicables, será fiscalizada por un síndico designado por el Poder Ejecutivo Nacional.

Las disposiciones de la Ley de Contabilidad sólo serán de aplicación al Banco en cuanto a la verificación de que las erogaciones encuadran en lo autorizado por su presupuesto administrativo mediante rendición de cuentas documentadas que, en forma anual, deberá presentar al Tribunal de Cuentas de la Nación.

El Síndico, que ejercerá los controles de legitimidad y régimen contable, deberá ser abogado, doctor en ciencias económicas o contador público nacional y reunir las demás condiciones exigidas

para los Directores. Durará dos años en sus funciones, pudiendo ser nuevamente designado.

En caso de fallecimiento, renuncia o impedimento del síndico o vacancia del cargo, se nombrará a otra persona para completar el período que corresponda.

**Artículo 22** - Son funciones del Síndico:

a) Efectuar los arqueos, controles, revisiones y verificaciones que estime necesarios sobre los aspectos operativos, contables, presupuestarios y administrativos con vista a comprobar que los actos y disposiciones del Banco se ajusten a las normas legales y reglamentarias pertinentes.

Acompañará con su firma los balances de fin de ejercicio y los estados generales de ganancias y pérdidas.

b) Concurrir a las reuniones del Directorio, en las que participará con voz pero sin voto.

c)Solicitar la convocatoria del Directorio cuando resulte necesario para la consideración de asuntos vinculados con el cumplimiento de sus funciones.

d) Informar al Directorio y al Poder Ejecutivo Nacional, por intermedio del Ministerio de Economía, sobre la gestión operativa de la Institución.

En el cumplimiento de sus funciones queda sujeto a las responsabilidades que para el desempeño de este cargo fijan las leyes de la Nación.

**Artículo 23** .- Las autoridades del Banco deben facilitar las tareas a cargo del Síndico, posibilitándole el acceso a la información y proporcionándole los medios necesarios.

CAPITULO VIII

OPERACIONES

**Artículo 24** .- El Banco podrá realizar por sí o con la participación de otras entidades locales o del exterior, todas las actividades y operaciones no prohibidas a los bancos comerciales o a la clase de la entidad que participe, por la Ley de Entidades Financieras.

Sin perjuicio de ello, podrá en especial:

a) Recibir toda clase de depósitos a la vista y a plazo y captar recursos especiales.

b) Obtener créditos en el país y del exterior y actuar como intermediarios de créditos obtenidos en moneda nacional o extranjera.

c) Operar con obligaciones y valores.

d) Emitir bonos y otras obligaciones.

e) Otorgar créditos a corto, mediano y largo plazo.

f) Constituir, promover o participar en la formación o establecimiento de bancos, consorcios u organismos bancarios internacionales, actuando aisladamente o asociado a otras entidades financieras o entes públicos o privados, nacionales, extranjeros o internacionales, ya sea en el país o en el exterior, que tengan por objeto realizar operaciones en el territorio nacional o en el extranjero, pudiendo igualmente tener su sede en la República Argentina o en el exterior, previa autorización del Banco Central de la República Argentina y aprobación expresa del Ministerio de Economía, mediante suscripción e integración de acciones, debentures o cualquier otra clase de títulos valores.

g) Promover la formación de consorcios que tengan por objeto desarrollar y fomentar las

exportaciones argentinas y participar en ellos o en los existentes con entidades financieras nacionales y otros entes públicos o privados de capital nacional, tanto en el país como en el exterior, pudiendo también hacerlo con entidades extranjeras o internacionales, previa opinión del Banco Central de la República Argentina y autorización expresa del Ministerio de Economía.

h) Promover la formación de empresas en el exterior a los fines de facilitar la exportación de bienes, servicios y tecnología argentina, en la que podrá participar, previa opinión del Banco Central de la República Argentina y autorización expresa del Ministerio de Economía, mediante el aporte de bienes de capital, suscripciones, integración de acciones, debentures o cualquier otra clase de títulos valores y otorgamiento de financiación.

i) Comprar, vender y administrar, con la previa opinión del Banco Central de la República Argentina y autorización expresa del Ministerio de Economía, activos en el interior y exterior en tanto dichas operaciones se vinculen al fomento o financiación del comercio exterior.

j) Brindar los servicios necesarios para facilitar el desarrollo de los negocios de comercio con el exterior, encarando su acción dentro de las políticas internacionalmente competitivas.

k) Concretar acuerdos de complementación con otros organismos del país y del exterior.

l) Efectuar inversiones en obligaciones o títulos públicos que se coticen en bolsa.

ll) Adquirir bienes inmuebles, acciones y obligaciones en defensa o en pago de sus créditos, y efectuar las inversiones necesarias para su mejor utilización y realización, concediendo a ese efecto, si fuera necesario, las facilidades del caso.

m) Otorgar fianzas y otra clase de garantías en moneda nacional o extranjera.

n) Operar en cambios.

ñ) Actuar como corresponsal, agente o representante de otros bancos o entidades financieras del país o del exterior, dentro de sus fines específicos.

o) Recibir valores y documentos en custodia y arrendar cajas de seguridad.

p) Conferir y aceptar mandatos relacionados con sus operaciones y administrar carteras de valores mobiliarios.

q) Ofrecer los servicios que el mercado necesite y siempre que no se opongan a los fines establecidos en el artículo 3 de la presente Carta Orgánica.

Esta enunciación no es taxativa ni excluyente de otras operaciones que no le estén prohibidas.

**Artículo 25** .- El Banco no podrá conceder créditos a la Nación, provincias o municipalidades ni a los organismos o reparticiones dependientes de ellas, salvo que cuenten con garantía especial de la Secretaría de Hacienda del Ministerio de Economía, que permita el efectivo reembolso automático del crédito.

Dicha garantía podrá considerarse suplida cuando mediase por parte de los prestatarios la cesión de fondos de coparticipación federal o de otras fuentes públicas o privadas, siempre que permita el reembolso automático del crédito.

Se exceptúan de esta prohibición a las empresas comerciales, industriales o de servicios del Estado nacional o de los Estados provinciales o municipalidades y a las empresas que pertenezcan total o parcialmente a cualquiera de esos Estados, que estén facultadas para contratar como personas de derecho privado, siempre que tengan patrimonio independiente, no subsistan exclusivamente de asignaciones del Estado y sus recursos sean suficientes para cumplir sus obligaciones con el Banco.

*(Sustituido por art. 3 de la Ley N° 25.299 B.O. 7/9/2000 Promulgada Parcialmente: Septiembre 4*

*de 2000.)*

CAPITULO IX

DISPOSICIONES GENERALES

**Artículo 26** .- Las relaciones del Banco con el Poder Ejecutivo Nacional se mantendrán por intermedio del Ministerio de Economía, salvo en cuanto a los asuntos de mero trámite en que se comunicará directamente con las reparticiones públicas que corresponda.

**Artículo 27** .- El Banco como entidad del Estado Nacional está sometido exclusivamente a la jurisdicción federal. Cuando sea actor en juicio, la competencia federal será concurrente con la justicia ordinaria de las provincias y la competencia nacional federal en lo civil y comercial de la Capital Federal con la de la justicia nacional común.

Queda facultado a no oponer la excepción jurisdiccional cuando actúe en países extranjeros, realizando actos comerciales como personas de derecho privado.

**Artículo 28** .- Los bienes del Banco, cualquiera fuese su origen o destino, incluso los adquiridos en defensa o en pago de sus créditos, sus actos propios y los de sus representantes, estarán exentos del pago de toda contribución o impuesto nacional, así como también las operaciones que efectúe el Banco, en la parte del impuesto que no estuviera a cargo de terceros. El Banco concertará con las provincias o municipios las exenciones que pudieran otorgársele.

**Artículo 29** .- Artículo 29: Las hipotecas de cualquier grado o naturaleza que se constituyan a favor del Banco de la Nación Argentina mantendrán las prerrogativas, privilegios y régimen de ejecución especial atribuidos a favor del ex Banco Hipotecario Nacional, por su carta orgánica.

El mismo régimen será aplicable a las preanotaciones hipotecarias que podrán disponerse con respecto a cualquier obligación contraída con el Banco, aún las que se encuentren en mora.

Los efectos del registro de hipotecas durarán hasta la completa extinción de la obligación hipotecaria, quedando exceptuados de lo dispuesto a este respeto por el Código Civil. Tampoco alcanza a los créditos hipotecarios del Banco la limitación que, en cuanto a caducidad del privilegio de los intereses por falta de ejecución, establece el artículo 3936 del mencionado Código.

*(Sustituido por art. 4 de la Ley N° 25.299 B.O. 7/9/2000, Promulgada Parcialmente: Septiembre 4 de 2000.)*

**Artículo 30** .- El Presidente del Banco absolverá por escrito posiciones en juicio, no estando obligado a comparecer personalmente.

**Artículo 31** .- Las retribuciones del Presidente, Vicepresidente, Directores y Síndico, serán las que fije el Poder Ejecutivo Nacional.

**Artículo 32** .- Salvo expresa disposición en contrario, establecida por ley, no serán de aplicación al Banco las normas que con alcance general hayan sido dictadas o se dicten para los organismos de la administración pública nacional, cualquiera fuese su naturaleza jurídica, de las cuales resulten limitaciones a la capacidad o facultades que le reconoce la presente Carta Orgánica. Cuando el Banco actúe en países extranjeros como persona de derecho privado no le serán aplicables las disposiciones de la Ley de Entidades Financieras ni las demás normas que se dicten en su consecuencia.

# EXHIBIT 3

ALBERTO B. BIANCHI
Abogado

April 1, 2008.

Considering the legal opinion you have requested, regarding the legal and political link that exists between the federal government of the Argentine Republic and the provinces that the Argentine Republic comprises, this is my preliminary view:

The expression "República Argentina" (RA) is broader than the concept of Federal Government. The RA is made up of both the Federal or National Government plus the Provincial or local governments.

This can be easily explained in the field of the international relations, and in particular when the RA (or "Nación Argentina", which is the same), signs a Bilateral Investment Treaty (BIT). That BIT applies to all the commercial relations between the signatory country (e.g., Germany) and the RA, no matter in which part of the RA the investment is made. In other words, whenever a BIT is entered into, the one that enters into the BIT on behalf of the RA is the Federal Government. But the BIT is binding not only for the Federal Government but also for all the Provincial governments as well.

Therefore, if the investment is made in the province of Tucumán and the local government of Tucumán fails to comply with the BIT (e.g., Tucuman expropiates the investment), the one who is responsible for paying the damages is the RA. Afterwards, if the Federal Treasury (part of the Federal Government) pays for those damages, the Federal Government can eventually obtain compensation from the Province of Tucuman.

From this example arise two sets of relationships: the foreign ones, where the RA represents the Federal Government plus each and every provincial government, on the one hand. And, on the other, the internal/domestic relationships between the Federal or National Government and the provincial governments.

Esmeralda 1320, piso 4, of. B          (54-11) 4327-1672
C1007ABT - Buenos Aires                ab@biagal.com.ar

ALBERTO B. BIANCHI

Furthermore, the Argentine Republic is a federal state, composed of various provinces. Each province is an independent state that has its own Constitution and its own elected authorities; these officers are elected with no interference of the federal government. Each province has tax raising powers; each province has the power to manage its own financial resources and is in no way accountable before the federal government for the way in which those resources are spent. From the legal viewpoint, each province is a legal person (Argentine Civil Code, 33).

Nevertheless, it is clear that each province is strongly subordinated to the federal government, and this can be illustrated by the following circumstances:

First, there is a legislative subordination because the argentine Constitution (AC) and the laws that are passed by the National Congress are hierarchically superior to the provincial constitutions and superior to the provincial laws. The international treaties that are concluded by the federal government are also hierarchically superior to the provincial laws (AC, 31). Furthermore, the AC declares that the governor of a province is "*the natural agent of the federal government in order to enforce the Constitution and the laws of the Nation*" (AC, 128).

It is because of this legislative superiority of the federal government that the provincial constitutions and provincial laws must comply with the basic principles set forth in the AC and in the laws passed by the national Congress. Should the provincial constitutions or provincial laws fail to comply with those principles, the federal Supreme Court may find them unconstitutional.

Besides, the federal Congress is empowered to pass all the laws that may be placed under the heading of "private law" (civil, commercial, labor laws), and the laws pertaining to penal law (AC, 75.12). This means that the provinces can only legislate in the field of public law (constitutional, administrative, taxing) and civil and criminal procedure.

ALBERTO B. BIANCHI

Second, the provinces are politically subordinated to the federal government. This can be demonstrated in various ways. From the international point of view, the federal government is the sole manager of foreign relations. The provinces cannot enter international treaties of a political nature with foreign nations (AC, 126). In the field of home policy, the federal government may seize a provincial government; this means that the federal government may force the provincial officers out whenever safety or the republican system are at stake. The federal government may also decree an *etat de siege* within the boundaries of a province (AC, 23). Finally, the provinces, as components of a federal state, may not segregate and become a new and sovereign state. Neither can the provinces engage in war against other provinces because this is considered a crime: sedition (AC, 127).

Third, there is fiscal subordination. The federal government is the sole collector of customs duties. The AC establishes a special prohibition by which the provinces cannot establish customs within their boundaries (AC, 9). Besides, the federal government collects the so-called "indirect taxes", i.e., the ones that are passed through on to the consumer; for example, the Value Added Tax (VAT). Regarding the so called "direct taxes" (i.e., Income Tax) even though they should be regulated and collected by the provinces, the federal CN sets up a system called "Federal Distribution". The Federal Distribution is the system by which the federal government (a) regulates direct taxes; (b) collects direct taxes, and (c) then distributes direct taxes according to the population, area and resources of each province (AC, 75.1 & 2). All this makes it evident that the provinces enjoy limited fiscal powers.

Fourth, there is monetary subordination. Only the federal government is empowered to, by means of the Central Bank of the Argentine Republic, coin money and regulate the value thereof (AC, 75.6). The provinces cannot establish banks empowered to coin money (AC, 126). To make up for that, the federal

ALBERTO B. BIANCHI

government may grant subsidies (financial aid) to a province whenever a province runs out of financial resources (AC, 75.9).

Fifth, there is a commercial subordination. Each province can regulate domestic commerce or local commerce that takes place within their boundaries, but all the interprovincial or inter-jurisdictional commercial activities are regulated by the federal government (AC, 75.13). This means that it is the national legislation that regulates the navigation of inter-jurisdictional rivers, the navigation of the continental seas, and all inter-jurisdictional activities (i.e., energy transmission; natural gas transportation and distribution; rail transportation; etc.); it also means that each of those activities are controlled by a national or federal agency. The official mail service is also national (AC, 75.14).

Finally, there is a territorial subordination: the federal government, by means of a law passed by Congress, may create, within a province, a "*place subject to federal regulation*" (AC, 75.30). These places may serve different purposes, such as military facilities, airports, ports, federal buildings for banks or national universities, etc. The federal Supreme Court has ruled that a province cannot lay taxes upon these federal places.

Esmeralda 1320, piso 4, of. B
C1007ABT - Buenos Aires

(54-11) 4327-1672
ab@biagal.com.ar

# EXHIBIT 4

Rio Negro Online

March 22, 2008

**The confusing "return" of the Santa Cruz' funds**

The Governor of Santa Cruz finally announced that the controversial funds will return to the country as of Tuesday through a "very complicated financial engineering", but surprisingly, did not specify the amount.

"Kirchner asked me to take care of them and also to spend them well". "The only thing I received from them (the K[irchner] couple [President Cristina Kirchner and her husband, former President, Nestor Kirchner]) is support and encouragement. They, who made it right to the top, are humble enough to engage in a discussion".

This and other affectionate comments published yesterday by "Clarin" seem to show that the small argument that the Governor had with the Kirchners, whose most obvious effect for his governance was to see how Federal funds to pay salaries and debts was delayed. The worst point of that struggle was when Peralta revealed Nestor Kirchner's lie, who had said that the funds were not in Switzerland.

[…]

The Governor assures that he is not planning to use the money "in the short term". But that the return of the funds will set the Province in the path of "industrialization." People of Santa Cruz know the cash flow difficulties that the State treasury is going through. Notwithstanding Peralta's assertions that he will not use the funds, as he has already done in the past, to pay salaries, the temptation will be huge. With regards to the "very complicated finance engineering" to distribute the millions, he briefly stated, "the Banco Central has also participated in the routing of the money together with the highest authorities of the Banco Nación. We will analyse with them the different financial alternatives next week, and from there on we will decide what we keep in fixed-term deposits, and what we cash.

"The trust administrator did what he thought it was safer to do. To me it did not seem to be badly managed. The funds were always managed from the country, that is why we cannot call it a repatriation, it was managed by a bank (Banco Santa Cruz) which is 49% property of the Province. At this stage, the Nación is the only [bank] with enough capacity to hold the amounts we are talking about. Among the alternatives, I can imagine leasing, that we can share it with municipalities, with a preferential rate with the Bank. We will try to establish development poles so that we industrialize the province."

[…]



**RIO NEGRO** | on line*

Buscar_
· RIO NEGRO · WEB

FAVORITOS
REGISTRARSE

| TITULOS | SECCIONES | SUPLEMENTOS | OPINION | CLASIFICADOS | SERVICIOS | NUESTRO DIARIO | PRODU |

Sábado 22 de Marzo de 2008                    LEA EDICION IMPRESA ·    RIO NEGRO       EDIC

**Comprá,**

EDICION IMPRESA PAG. 04 » NACIONALES

# El confuso "regreso" de los fondos de Santa Cruz

El gobernador santacruceño Daniel Peralta anunció finalmente que los polémicos fondos de su provincia volverán el martes al país a través de una "ingeniería bastante complicada", pero insólitamente no supo decir de cuánto dinero está hablando.

"Kirchner me pidió que cuide los fondos y los gaste bien". "Lo único que yo recibí de ellos (el matrimonio K) es apoyo y acompañamiento. Con la humildad que tienen de aceptar discutir, ellos que llegaron a todo..."

Estas y otras referencias afectuosas reproducidas ante "Clarín" ayer, parecen querer expresar que quedó atrás el breve enfrentamiento que el gobernador libró con los Kirchner y cuyo efecto más evidente para su gestión fue sentir cómo Nación le demoraba remesas para el pago de certificaciones de obras o para los sueldos y pagos a proveedores atrasados. El peor momento de esa lucha fue cuando Peralta dejó al desnudo la mentira de Néstor Kirchner, quien sostenía que los fondos no estaban en Suiza.

A propósito, la famosa expresión de Kirchner de que "todo, todo el dinero está en el país" fue dicha en setiembre del 2007 ante una radio de Buenos Aires. Ahora, a la pregunta de cómo se gestó el regreso de los fondos, Peralta dice en la entrevista: "Empezamos a hablar con Néstor el año pasado, en setiembre. Hubo tanta polémica... pero nosotros no perdimos tiempo. Sancionamos leyes en la Legislatura, el dinero quedó bancarizado y las dudas se despejan en el extracto de la cuenta corriente".

El gobernador asegura que no tiene previsto usar el dinero "en lo inmediato". Pero que el regreso de los fondos pondrá a la Provincia en el camino de la "industrialización". Los santacruceños saben de las graves dificultades de caja que afronta el Estado. Más allá de que Peralte jure que no dará un manotazo a esos fondos como en mínima parte hizo ya para sueldos, la tentación será grande. Sobre la "ingeniería bastante complicada" para repatriar los millones, apenas agregó: "Participó también el Banco Central siguiendo el ruteo del dinero, y las más altas autoridades del Nación. Vamos a analizar con ellos la semana que viene las distintas alternativas financieras, y a partir de ahí resolver qué guardamos a plazo fijo, qué monetizamos en cuentas a la vista".

"El administrador que manejó el fideicomiso hizo lo que pensaba que daba mas seguridad. A mí no me parecía mal cómo estaba manejado. Siempre con la administración en el país, por eso no va la palabra repatriación, fue administrado por

un banco (el Santa Cruz) del cual la provincia tiene 49% de las acciones. En esta etapa, el Nación es el único que tiene espaldas para el volumen del que hablamos. Entre las herramientas imagino el leasing, que podamos compartir con municipios, con una tasa preferencial con el Banco. Trataremos de generar polos de desarrollo para industrializar la provincia".

-¿Podrían parte de esos fondos volver a ser depositados en cuentas en el exterior?, le preguntó el diario. Respondió: "No me parece por el momento. Estamos en condiciones de utilizarlos".

¿De cuánto dinero hablamos? Peralta no supo decirlo. Dijo que no podía dar el monto actual de los fondos y que se basaba en el último balance de diciembre del 2006, que fue de u$s 520 millones. Aunque por deducciones por el pago de salarios, sería de u$s 480 millones. "No quiero que se diga que el gobernador es un improvisado. Hay que esperar el informe oficial (...) Hay cierres de títulos, bonos del Tesoro de EE. UU., BODEN y cuatro fideicomisos, además del dinero en efectivo en el Credit Suisse". Como se recordará, fueron 630 millones de dólares los que recibió Santa Cruz en 1993 por una deuda de regalías mal liquidadas por la Nación.

"Una fábula"

Finalmente, otra respuesta confusa a una grave sospecha:

¿Está asociada la decisión de traer los fondos a aclarar la compra de YPF por el grupo Eskenazi?

-"Absolutamente para nada. Clarín hizo una investigación sobre la compra de YPF que me pareció muy bien, pero la oposición dijo que se habían tomado fondos para garantizar la operación. Una fábula". Ocurre, sin embargo que "Clarín" en su informe publicado el 16 de marzo dio a conocer "documentos presentados ante las autoridades financieras de Estados Unidos que muestran que el grupo argentino Petersen tomó un crédito de 71,5 millones de dólares garantizado con fondos que mantiene en el banco Credit Suisse para dotar de capital a una subsidiaria australiana que compró el mes pasado una parte de la petrolera YPF.

La existencia del crédito, otorgado por la financiera suiza Chervil Capital Invest , y de la garantía, no habían sido informados cuando Repsol anunció el 21 de febrero el ingreso de la familia Eskenazi, propietaria de Petersen, en el capital de YPF".

Semanas antes, "Río Negro", en el artículo titulado "los puntos oscuros de la compraventa de YPF", advirtió la posibilidad de que el crédito concedido Petersen Energía SA (la empresa de capital irrisorio de Eskenazi que aparece como compradora de YPF) esté vinculado con los fondos de la provincia de Santa Cruz depositados en el Crédit Suisse. Todo prácticamente fue confirmándose: Peralta admitió que en el Credit Suisse de Suiza estaban los fondos santacruceños, en una operación administrada por el banco Santa Cruz (que maneja Eskenazi). También está probado que el Credit Suisse fue agente crediticio para el préstamo a Petersen para la compra. Un círculo llamativo.

💬 Haga su Comentario

# EXHIBIT 5

Ambito Financiero

March 20, 2008

**Peralta set up a date for the return of the funds: next Tuesday**

[…]

However, Peralta, along with all others who have tried to explain the destiny of the funds, added more confusion to the soap opera. he said that he had agreed with the Kirchner's what to do with this money, but explained later that they did not speak of repatriation.

On the other hand, it was agreed [between the Governor and the President], to change the administration of the trust from the Banco Santa Cruz to the Banco Nación. In respect of the actual amount, governor Peralta affirmed that "we don't know it exactly, but I can assure it includes all the funds, papers, bonds and dollars" derived from a case the Province won in 1993, concerning the incorrect payment of oil royalties.

[…]

Three years ago, former President [Kirchner] had announced the repatriation of the entire sum of the funds valued at US$ 532.000.000. Notwithstanding, it was Peralta himself who unveiled part of the mystery: he affirmed that there were still US$ 390.000.000 in a Credit Suisse account at its Zurich branch.

[…]

Last year, […] Néstor Kirchner said that all of the funds had been repatriated.

[…]

The controversy increased again. All the opponents unanimously agreed that the funds' new announcement "is another lie of the presidential couple".



EN INFORMACION FISCAL

Suscríbase aquí    Bienvenido Beaumont Sonia        Cerrar Sesión    Cambio de Clave

Ambitoweb como Página de Inicio | Mapa del sitio | Mediakit | Ambito On Mail | Acerca de Ambito Fin

• Edición Impresa                                                          Ingrese su
• Ediciones Anteriores            **ambitoweb**
• Contáctenos        Edición 2701 - Domingo 23 de Marzo de 2008    • Búsqueda Ava

Portada ▾ Secciones ▾ Servicios ▾ Suplementos ▾ Canal Ambito ▾ Especiales ▾ Centro de Documentación ▾ Quinchos

Edición del: 20/03/2008        [A+][A-]                    🖶
                              Tamaño texto    Formato Impresi

# Peralta puso fecha a regreso de fondos: el próximo martes

**Santa Cruz** - El gobernador de Santa Cruz, **Daniel Peralta**, se vio obligado a salir a anunciar en soledad fecha y lugar para el retorno de los **u$s 390 millones** que la provincia mantiene en el exterior desde la época en que **Néstor Kirchner** era gobernador. Lo hizo ante la aparente indiferencia que **Cristina de Kirchner** mostró durante su paso por la ciudad de Gobernador Gregores, donde la ex primera dama tenía previsto compartir con Peralta un nuevo capítulo del culebrón por el destino de los polémicos ahorros. Los mismos que nunca regresaron en su totalidad al país, a pesar del rimbombante anuncio que el propio Kirchner protagonizó en 2005, junto al entonces gobernador **Sergio Acevedo**.

Forzado por el silencio de la Presidente, el santacruceño no postergó la definición y dijo que esos activos estarán de regreso en la Argentina el próximo martes, y que serán depositados bajo la figura de un fideicomiso en el Banco Nación.



Sin embargo, Peralta -como todos quienes han intentado explicar el destino de los fondos- agregó más confusión a la novela. Dijo que había consensuado con los Kirchner qué hacer con ese dinero, pero aclaró después que en ese encuentro no se habló de repatriación. Sí, en cambio, se acordó cambiar la administración por el fideicomiso del Banco Provincia de Santa Cruz por el del Banco Nación. Sobre el monto real dijo que «no sabemos con exactitud, pero sí puedo afirmar que se trata de todos los fondos, papeles, bonos y dólares», fruto de un juicio que la provincia ganó en 1993 por regalías petroleras mal liquidadas. Parte de esos ahorros fueron utilizados en 2007 por Peralta para hacer frente a los reclamos salariales que pusieron en jaque la institucionalidad de la provincia presidencial.

Ese detalle es, precisamente, el eje del conflicto. El ex presidente había anunciado hace tres años que se repatriaría la totalidad de los fondos, estimados en **u$s 532 millones**. Pero fue el propio Peralta el encargado de revelar parte del misterio: dijo que, en realidad, todavía quedaban en una cuenta en el Banco Credit Suisse, sucursal Zurich, de Suiza, alrededor de **u$s 390 millones**.

Al referirse a cómo serán invertidos, dijo que se está estudiando un plan de inversión que va a ser consensuado con todos los intendentes y distintas fuerzas de la comunidad. Indicó que está «analizando» si se pondrá en marcha un organismo de control y seguimiento.

• Cuentas separadas

Con referencia a si serán incluidos en el Presupuesto 2008 de la provincia, señaló: «Son cuentas separadas, nada más», y que el Presupuesto será presentado en la Cámara en diez días.

Aunque intentó aplacar el desencuentro con la jefa de Estado, lo cierto es que los Kirchner volvieron a dejar solo ayer al gobernador de Santa Cruz.

**Cristina de Kirchner** se limitó a inaugurar una mina y concurrió a un acto posterior con el gobernador por el 86° aniversario de la ciudad santacruceña de Gobernador Gregores, donde sólo aconsejó a los argentinos cuidarse de los accidentes de tránsito durante Semana Santa.

El año pasado, en plena campaña electoral de su esposa, **Néstor Kirchner** había dicho que la totalidad de los fondos habían sido repatriados. El anuncio sobre el destino actual de los millones estaba en principio previsto para la semana pasada durante la estadía de Peralta en El Calafate. Finalmente, se decidió postergarlo hasta ayer y sumar a la Presidente a la foto. Pero ello tampoco ocurrió.

La polémica volvió a acrecentarse. Desde todo el arco opositor coincidieron en

que el nuevo anuncio sobre los fondos «es otra mentira más del matrimonio presidencial».

[A+][A-]     Formato Impresión     Enviar por mail
Tamaño texto

**Hoteles en Santa Cruz**
Buscar hoteles disponibles. ¡Con ofertas especiales!
www.booking.com

**Vols Pour Santa Cruz**
Billets d'avion à bas prix -65% Comparez les Compagnies Aériennes
Vol-Santa-Cruz.billet-avion.cc

**Hotel Garni Kirchner**
Hoteles, tarifas, información Críticas y más en TripAdvisor
www.TripAdvisor.es

**Vols Santa Cruz**
Santa Cruz : Comparez les Prix Disponibilités en temps réel !
www.easyvols.fr

Anuncios Google

◄┤ Atrás                    Arriba ├►

Ambitoweb como Página de Inicio  |  Mapa del sitio  |  Mediakit  |  Acerca de Ambito Financiero | Autoridades de Ambito

**Portada de ambitoweb | Edición Impresa | Ediciones Anteriores**

Copyright © 2000 Ambitoweb.com - Todos los derechos reservados. - (Términos y condiciones de uso) - Contácte

**IAB**
Argentina
Miembro de **Interactive Advertising Bureau**

Auditamos con **Certifica Met**

# EXHIBIT 6

Pagina 12

March 19, 2008

**Mission: return**

The Governor of Santa Cruz, Daniel Peralta, admitted tonight that the announced return of the funds that the province had deposited in a Swiss bank "was agreed" with former president Nestor Kirchner and his wife, the current president, Cristina Fernandez. During an act that he led in the Municipalidad de Gobernador Gregores, Peralta also stated that it was about "all the deposits" that were abroad, although he did not state the precise amount.




| Principal | Secciones | ⇩ | Suplementos | ⇩ | Anteriores | Correo | | Buscar |

Búsqueda avanzada



La reflexión lingüística

Ultimas Noticias | **Miércoles, 19 de Marzo de 2008** | Hoy       ⊙━ Ingresar | Registrarse       ! Mis Recortes: 0 [C

PAPELES, BONOS Y DOLARES

# Operativo retorno

El gobernador de Santa Cruz, Daniel Peralta, admitió esta noche que el anunciado retorno de los fondos que la provincia tenía depositados en un banco suizo "fue consensuado" con el ex presidente Néstor Kirchner y su esposa, la actual presidenta, Cristina Fernández. Durante un acto que encabezó en la Municipalidad de Gobernador Gregores, Peralta también indicó que se trata de "la totalidad de los depósitos" en el exterior, aunque no dio precisiones sobre el monto del dinero.







La presidenta Cristina Fernández de Kirchner, junto al gobernador de Santa Cruz, Daniel Peralta, durante un acto en Casa de Gobierno, en diciembre de 2007.



Webujos de
**Daniel Paz**

---

Principal | Secciones | Suplementos | Rosario/12 | Anteriores | Búsqueda | Publicidad | Institucional |

**Página/12**    HOSTED BY *fx*

© 2000-2008 www.pagina12.com.ar | República Argentina | Todos los Derechos Reservados

# EXHIBIT 7

SITUATION OF THE SANTA CRUZ FINANCIAL ASSETS

Río Gallegos, 31 Mar. 08 (DPP). The Minister of Economy and Public Works of Santa Cruz, C.P.N. Juan Manuel Campillo, reported that the Financial Assets of the Government of Santa Cruz, product of the poorly settled petroleum royalties, reach the sum of 554,202,122.91 United States Dollars.

For investments administered by Banco Nación, the sum reaches 513,456,388.32 (cash, securities and trusts), while for investments administered by Banco Santa Cruz S.A. the sum reaches 40,745,734.60 (trusts), which in total amounts to the figure for the provincial funds.

In the middle of last week, Campillo confirmed that the transfer operation had been formalized for the funds to the accounts in the name of the Province of Santa Cruz at Banco de la Nación Argentina, corresponding to the financial assets of the Santa Cruz state, which was expressed through Decree Number 483/08, confirming Act Number 010/08 of the Executive Committee of the Comptroller.

In relation to the development of the assets, one may be reminded that by Provincial Law Number 2663 and its modifications in full effect, imposes the obligation to present the respective accountings of the situations of such financial assets prior to 30 April of each period, to which end Governor Daniel Peralta has ordered that these reports be remitted – on time and in the proper form – to the Accounts Tribunal, which then sends them to the provincial Chamber of Deputies for analysis and consideration.



## Prensa
### Gobierno de Santa Cruz

| Martes 01 de Abril de 2008 | Busc |

**Ultima Actualización a las 23:35:53**



Principal

Noticias Anteriores

Banco Fotografico

Audio

Video

Enlaces

www.santacruz.gov.ar

contacto »

SITUACION DE LOS ACTIVOS FINANCIEROS DE SANTA CRUZ

 **Imprimir**

**A** - **Fuente mas chica**

**A** - **Fuente mas grande**

Río Gallegos, 31 Mar 08 (DPP) El Ministro de Economía y Obras Públicas de Santa Cruz, C.P.N Juan Manuel Campillo informó que los Activos Financieros del Gobierno de Santa Cruz producto de las regalías mal liquidadas, ascienden a la suma de 554.202.122,91 dólares estadounidenses.

En concepto de inversiones administradas por el Banco Nación la suma asciende a 513.456.388,32 (efectivo, títulos y fideicomisos), mientras que en inversiones administradas por el Banco Santa Cruz S.A. la suma asciende a 40.745.734,60 (fideicomisos), lo que sumado acredita la cifra respectiva a los fondos provinciales.

A mediados de la semana pasada, Campillo confirmaba que había quedado formalizada la operatoria de traspaso de fondos a las cuentas titularidad de la Provincia de Santa Cruz en el Banco de la Nación Argentina, correspondientes a los activos financieros en poder del Estado santacruceño, lo que quedó plasmado mediante Decreto N° 483/08 que ratificó lo actuado en el Acta N° 010/08 del Comité Ejecutivo de Contralor.

En relación al desenvolvimiento de los activos, cabe recordar que por Ley Provincial N° 2663 y modificatorias que se encuentran en plena vigencia, se impone la obligación de presentar las rendiciones respectivas sobre la situación de tales activos financieros antes del 30 de abril de cada período, para lo cual el gobernador Daniel Peralta ha ordenado remitir estos informes -en tiempo y forma- al Tribunal de Cuentas, quien posteriormente los despacha para su análisis y consideración a la Cámara de Diputados provincial.

mrm

 volver

2005 | Dirección Provincial de Prensa -  Gobierno de la Provincia de Santa Cruz
**Sistema desarrollado por la Subsecretaria de Informatica**
**informatica@santacruz.gov.ar**

# EXHIBIT 8

**"Peralta stated that the Santa Cruz funds are already in the country"**
**(La Nacion, 2 April 2008)**

According to the governor, they arrived on Friday.

The governor Daniel Peralta stated yesterday that the Santa Cruz funds are in Buenos Aires since last Friday, safeguarded from possible executions of Argentinean creditors abroad.

"All of the funds are already in the *Banco Nación* headquarters. If I feel like, I can go there now and withdraw them", declared Peralta to LA NACION during a demonstration in support of Cristina Kirchner in Plaza de Mayo [Buenos Aires].

The governor indicated, that this money (USD$554 million) was not covered by the seizure ordered last Thursday by the courts of the U.S., which, as it was reported yesterday, ordered the freezing of accounts of Argentina in New York until today.

These measures had been requested by the U.S. company CMS Gas Transmission, which has an award against the State issued by an arbitral tribunal of the World Bank (ICSID) for US$133.2 million. The company requested the attachment in New York based on the suspicion that the Santa Cruz funds could pass through New York in their transit from Switzerland to Argentina.

Peralta stated yesterday that *"They* [CMS] *fell for the trick"* [literally "se comieron el amague"], who said that the money never went through the U.S., but it was brought directly from Switzerland to the country. The route, according to him, was Zurich-Basel-Buenos Aires.

"It was never planned to bring it through New York. Clearly, someone was misinformed, because we, for obvious reasons, never said how we would be doing the routing", he stated.

Today, Judge Loretta Preska will hold the hearing with CMS and Argentine lawyers. It is scheduled that in the hearing it will be announced if bank accounts of Argentina were found in the U.S.

According to Peralta, the possibility of sending the Santa Cruz funds through the U.S was considered, but in the end the option was called off since "some vulture funds may ask for an injunction" and because of that, he affirmed, Basel was chosen "as the safest route."

The President of *Banco Nación*, Mercedes Marcó del Pont, confirmed yesterday that the funds were in the bank's headquarters.

According to Peralta, a portion is deposited in cash; the rest, in titles, bonds and in a trust. "The idea is to cash all of it", affirmed the governor, who said that he was

considering, alongside with Marcó del Pont, how to do this without destabilizing the market.

Later on, in a radio interview, Peralta stated that "as it is provided by the law", he will be rendering, prior to 30 April 2008, a report on the funds before the Province's Court of Auditors.

The return of the funds, derived from incorrect payments of oil royalties, had been announced by Néstor Kirchner in May 2007, but thus far it has not materialized. Until this week, no one had specified the actual amount at stake.

LANACION.com

**LANACION-com ·**
## Buscador

Miércoles 2 de abril de 2008

Noticias | Buscador | Nota

# Peralta dijo que los fondos de Santa Cruz ya están en el país

Según el gobernador, llegaron el viernes

El gobernador Daniel Peralta dijo ayer que los fondos de Santa Cruz se encuentran en Buenos Aires desde el viernes pasado, a resguardo de posibles ejecuciones de los acreedores de la Argentina en el extranjero.

"Todos los fondos ya están en el Banco Nación, en la sucursal central. Si quiero, cruzo ahora y saco la cantidad que necesite", declaró Peralta a LA NACION durante el acto de apoyo a Cristina Kirchner en la Plaza de Mayo.

Según indicó el gobernador, este dinero (554 millones de dólares) no fue alcanzado por el embargo dispuesto el jueves pasado por la justicia de los Estados Unidos, que, como se informó ayer, ordenó congelar hasta hoy las cuentas de la Argentina en Nueva York.

Esta medida había sido solicitada por la empresa norteamericana CMS Gas Transmission, que le ganó un juicio al Estado ante el tribunal arbitral del Banco Mundial (Ciadi) por 133,2 millones de dólares. La compañía pidió el embargo en Nueva York basada en la sospecha de que los fondos de Santa Cruz podrían pasar por allí en su tránsito de Suiza a la Argentina.

"Se comieron el amague", dijo ayer Peralta, que advirtió que el dinero nunca pasó por los Estados Unidos, sino que se trajo directo de Suiza al país. El camino fue, según él, Zurich-Basilea-Buenos Aires.

"Nunca estuvo previsto traerlo por Nueva York. Evidentemente, alguien informó mal, porque nosotros, por razones obvias, nunca difundimos cómo íbamos a hacer el ruteo", sostuvo.

Hoy, la jueza estadounidense Loretta Preska celebrará una audiencia con los abogados de la compañía CMS y los del Estado nacional. Está previsto que en esa reunión se informe si se encontraron cuentas a nombre de la Argentina en los Estados Unidos.

LANACION.com

Según Peralta, se analizó la posibilidad de que los fondos de Santa Cruz volvieran por allí, pero se desistió, porque se pensó que "algún fondo buitre podía pedir el embargo" y por eso, destacó, se eligió Basilea como "la ruta más segura".

La presidenta del Banco Nación, Mercedes Marcó del Pont, confirmó ayer que los fondos estaban en la casa matriz de la entidad.

Según Peralta, una parte está depositada en dinero; el resto, en títulos, en bonos y en un fideicomiso. "La idea es monetizarlo todo", afirmó el gobernador, que dijo que estaba evaluando junto con Marcó del Pont cómo hacerlo sin desestabilizar el mercado.

Más tarde, en una entrevista radial, Peralta declaró que, "como bien lo marca la ley", tiene previsto presentar una rendición sobre estos fondos ante el Tribunal de Cuentas de la provincia antes del 30 de abril.

El regreso de los fondos, producto de regalías petroleras mal liquidadas, había sido anunciado por Néstor Kirchner en mayo de 2007, pero nunca se había concretado. Hasta esta semana, nadie había precisado siquiera de cuánto dinero se trataba.

Link corto: http://www.lanacion.com.ar/1000641

Noticias | Buscador | Nota

📄 Imprimir    ✉ Enviar por e-mail

Herramientas

📄 Imprimir
✉ Enviar por e-mail

Copyright 2008 SA LA NACION | Todos los derechos reservados

# EXHIBIT 9

**March 31, 2008**

Official: The Repatriated Santa Cruz Funds Total USD 554,202,122.91

The government of Santa Cruz confirmed this afternoon that the financial assets that this province had deposited abroad reached 554,202,122.91 United States Dollars in cash, securities and trusts.

According to an official report by the management of Daniel Peralta, the money is already deposited in two investment accounts in Argentina, one in Banco Nación and the other in Banco de Santa Cruz.

The announcement was made by the Minister of the provincial economy, Juan Manuel Campillo, who specified that in the Nación account there were 513,456,388.32 dollars in cash, securities and trusts; while in the Banco de Santa Cruz account there were 40,745,734.60 dollars in trusts.

In the middle of last week, the government had confirmed the formalization of the transfer operation of the funds from Banco de Santa Cruz to Banco Nación, although he had avoided specifying the amount of the operation.

According to the latest official report, the province had 390 million dollars deposited in Credit Suisse in paper – bonds and treasury notes – and in Argentina another 93 million in Boden 2002.

The money was part of a larger amount that the province had received in April 1993, after an extrajudicial agreement with the State for poorly settled petroleum royalties.

The agreement with the national government of then president Carlos Menem had reached 654 million dollars, of which more than 100 million were at that time invested in YPF stocks.

The rest were converted into a mix of bonds and notes that in April 1993, the administration of then local governor Néstor Kirchner removed from the country to their first destination: the United States.

Later, in 1999, in the context of the purchase by Repsol of the YPF stock package, Santa Cruz decided to sell its stocks for greater than market price, double the amount that the province paid in 1993, about 1.1 million dollars.

Two years later, the province divided its assets between the United States and Switzerland.  Later, in 2004, it brought its deposits together at Credit Suisse Private Banking, in Switzerland.

On 1 August 2005, then President Kirchner, together with the governor, Sergio Acevedo, announced the repatriation of the funds in a custodial account in Banco Santa Cruz and affirmed that within a year, all the money would be in Argentina.

In May 2007, Kirchner confirmed that the money was in the country: "All [the funds] are repatriated, some were invested in projects and the rest are being administrated by the provincial bank."

Nevertheless, one year before, an official report from the Accounts Tribunal of Santa Cruz had affirmed that as of 31 December 2006, the province retained up to 520 million dollars in extra funds, of which more than 390 million were in an account at Credit Suisse.

On 13 March of this year, Governor Daniel Peralta confirmed that "the funds remained deposited in the Trust in the name of Banco Santa Cruz in Switzerland."

This date was confirmed by Peralta days after he became aware of the presentation of public prosecutor Andrés Vivanco, who demanded the investigatory declaration of Néstor Kirchner and his successors, that they might explain the management of the funds.

Ambitoweb.com



Lunes 31 de Marzo de 2008

Informaciones de la Argentina y el Mundo

Seccion: economia

# Oficial: los fondos de Santa Cruz repatriados son u$s 554.202.122,91

Lo anunció el gobernador Peralta

El gobierno de Santa Cruz confirmó esta tarde que los activos financieros que esa provincia tenía depositados en el exterior ascienden a 554.202.122,91 dólares estadounidenses, en efectivo títulos y fideicomisos.

Según informó oficialmente la gestión de Daniel Peralta, el dinero ya se encuentra depositado en dos cuentas de inversión en la Argentina, una del Banco Nación y otra del Banco de Santa Cruz.

El anuncio lo realizó el ministro de Economía provincial, Juan Manuel Campillo, quien puntualizó que en la cuenta del Nación quedaron 513.456.388,32 dólares en efectivo, títulos y fideicomisos; mientras que en el Banco de Santa Cruz hay 40.745.734,60 dólares en fideicomisos.

A mediados de la semana última, el gobierno había confirmado la formalización de la operatoria de traspaso de los fondos desde el Banco de Santa Cruz al Banco Nación, aunque había evitado precisar el monto de la operación.

Según el último informe oficial, la provincia tenía depositados en el Crédit Suisse 390 millones de dólares en papeles -bonos, letras del tesoro- y en la Argentina otros 93 millones en Boden 2002.

El dinero formaba parte de un monto más amplio que la provincia había percibido en abril de 1993, luego de un acuerdo extrajudicial con la Nación por regalías petroleras mal liquidadas.

El convenio con el Gobierno nacional del entonces presidente, Carlos Menem, había alcanzado los 654 millones de dólares, de los cuales más de 100 millones fueron invertidos en esa época en acciones de YPF.

El resto fue convertidos en un mix de bonos y letras que en abril de 1993, la administración del entonces gobernador local, Néstor Kirchner, sacó del país a su primer destino: Estados Unidos.

Luego, en 1999, en el marco de la compra de Repsol del paquete accionario de YPF, Santa Cruz decidió vender sus acciones a un valor superior al mercado, algo que duplicó el monto que pagó la provincia en 1993, unos 1.100 millones de dólares.

Dos años después, la provincia dividió sus activos entre Estados Unidos y Suiza. Más tarde, en 2004, unificó los depósitos en el Banco Crédit Suisse Private Banking, en Suiza.

El 1 de Agosto de 2005, el entonces presidente Kirchner, junto al gobernador, Sergio Acevedo, anunció la repatriación de los fondos a una cuenta custodia en el Banco Santa Cruz y afirmó que en un plazo de un año todo el dinero estaría en la Argentina.

En mayo de 2007, Kirchner ratificó que el dinero estaba en el país: "Están todos repatriados, algunos fueron invertidos en obras y el resto está siendo administrado por el banco de la provincia".

Sin embargo, un año antes, un informe oficial del Tribunal de Cuentas de Santa Cruz afirmó que la provincia conservaba al 31 de diciembre de 2006 fondos extraordinarios por 520 millones de dólares, de los cuales más de 390 millones estaban en una cuenta en el Crédit Suisse.

El 13 de marzo de este año, en tanto, el gobernador Daniel Peralta confirmó que "los fondos seguían depositados en el Fideicomiso a nombre del Banco Santa Cruz en Suiza".

Ese dato fue ratificado por Peralta días después de que se conociera la presentación del fiscal Andrés Vivanco, quien exigía la declaración indagatoria de Néstor Kirchner y sus sucesores, para que expliquen el manejo de los fondos.

[A+][A-]
Tamaño texto

Imprimir

Copyright © 2000 Ambitoweb.com - Todos los derechos reservados.

# EXHIBIT 10

08 CV 03169

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                               :
CMS Gas Transmission Company,                                  :     **TEMPORARY**
                                                               :     **RESTRAINING ORDER AND**
                    Petitioner,                                :     **ORDER TO SHOW CAUSE**
                                                               :     **FOR AN ORDER OF**
         - against –                                          :     **ATTACHMENT**
                                                               :
The Republic of Argentina,                                     :
                                                               :
                    Respondent.                                :
                                                               :
                                                               :
-------------------------------------------------------------- x


        Upon consideration of the Petition of CMS Gas Transmission Company ("CMS"), the

accompanying Declaration of Alexander A. Yanos, Esq., and the accompanying memorandum of

law, and sufficient cause appearing therefore, and further,

        An application having been made by CMS for a temporary restraining order pursuant to

Federal Rule of Civil Procedure 64 and CPLR § 6210 against respondent The Republic of

Argentina ("Argentina") ordering Argentina and persons acting in concert with Argentina not to

withdraw or transfer (or permit the withdrawal or transfer of) monies of securities (the "Funds")

from any accounts held by Argentina (the "Accounts") and maintained at Banco de la Nacion

Argentina or elsewhere within the Southern District of New York;

        IT APPEARING that, pending the hearing and determination of CMS's motion for     HBM

attachment and injunctive relief, temporary relief is necessary to preserve the status quo and it

appearing that without such relief Argentina or others acting on its behalf might transfer, assign,

or remove the Funds from the Accounts, and it appearing that temporary relief without notice to

Argentina is contemplated by N.Y. CPLR § 6210 and Federal Rule of Civil Procedure 64, and is

further appropriate and necessary in order to prevent Argentina or others acting on its behalf

from transferring, assigning, or removing the Funds from the Accounts, prior to the granting of a

motion on notice, which transfer, assignment or removal could render uncollectible any

judgment that CMS obtained in this action; now, therefore:

IT IS HEREBY ORDERED that Argentina show cause before the Honorable *CHIEF JUDGE*

*KIMBA WOOD*, United States District Judge, ~~in Courtroom~~ *on the 16 flea*, United States

*500 PEARL ST*

Courthouse, _____, New York, New York on the ~~27th day of March, 2008~~ *first day of April*, at *10 AM* o'clock ~~p.m.~~,

or as soon thereafter as counsel may be heard, why an order should not be entered pursuant to

Rule 64 of the Federal Rules of Civil Procedure and article 62 of the New York CPLR attaching

assets of Argentina pending the final hearing and determination of this action; and



*The attachment will issue forthwith — The TRO is returnable on 4/1/0*

IT IS FURTHER ORDERED, pursuant to Rule 64 of the Federal Rules of Civil

Procedure and CPLR § 6210, that (1) Banco de la Nacion Argentina and other persons holding

Accounts of Argentina shall promptly be served with a copy of this Order; (2) pending the

hearing ~~and determination~~ of CMS's motion for an attachment, Banco de la Nacion Argentina

and other persons holding Accounts of Argentina shall, from the moment of receipt of actual

notice of this Order, refrain from transferring, removing or moving the Funds in the Accounts;

(3) Banco de la Nacion Argentina and other persons holding Accounts of Argentina shall

promptly notify this Court and the Consortium of any attempts by Argentina to move, transfer,

withdraw, or otherwise pay, disburse or dissipate the Funds in any manner; and (4) Banco de la

*all papers will be served on the bank see (1) above & the agent of Argentina by express mail tonight 3/27/08 and any papers in opposition to the TRO will be served on Freshfields 520 Madison Ave M g M g by noon on 3/31/08*

Nacion Argentina and other persons holding Accounts of Argentina shall promptly notify

counsel for CMS of the balances of the Accounts; and

IT IS FURTHER ORDERED, that service of this order to show cause for attachment and

temporary restraining order, together with papers submitted in support thereof, shall be deemed

good and sufficient service if made by United States Express Mail delivery to counsel for

Respondent Argentina with a copy mailed by United States Express Mail to the offices of the

Procurador del Tesoro de la Nacion Argentina by or before _10_ o'clock on April __, 2008, such

service to be made by any person who is over 18 years of age and not a party to this action.

Dated: New York, New York
       March 27, 2008

United States District Judge

# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

FG Hemisphere Associates, L.L.C.,                    :

                        Plaintiff,       :

          v.                              :

Republique de Congo,                                 :

                Defendant.       :

-------------------------------------------------------------x

01 CIV. 8700 (SAS)

**[PROPOSED] ORDER GRANTING
MOTION TO EXECUTE ON
JUDGMENT**

Plaintiff FG Hemisphere Associates, L.L.C. ("FG Hemisphere"), having obtained

a judgment entered on July 24, 2002 (the "Judgment") in its favor and against defendant

Republique du Congo (the "Congo") with respect to obligations of the Congo arising under a

certain loan agreement dated as of July 7, 1982 (the "Loan Agreement") and a promissory note

evidencing the same (the "Note"); and

      FG Hemisphere having duly given the Congo notice of the entry of, and copies of,

the Judgment pursuant to 28 U.S.C. § 1608(a) and filed proof of the same with this Court; and

      The Congo having failed to pay the Judgment, or any part thereof,

notwithstanding such notice; and

      The Congo having in the Loan Agreement expressly and irrevocably waived any

immunity of itself, of any of its assets, revenues and properties, and of any assets, revenues and

properties of any central bank or monetary authority of the Congo, from execution or attachment

in aid of execution on the grounds of sovereignty or otherwise; and

More than thirty (30) days having elapsed since the entry of the Judgment, such time constituting a reasonable period of time for execution in this matter pursuant to 28 U.S.C. § 1610(c); and

Upon consideration of plaintiff FG Hemisphere's Memorandum of Law in Support of Motion For Permission to Execute on Judgment dated August 29, 2002, the Affidavit of H. Helen Chen Regarding Service of Process sworn to August 28, 2002, the Affidavit of H. Helen Chen in Support of Motion For Permission to Execute on Judgment sworn to August 28, 2002, and all other papers filed in this matter;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff's Motion to Execute on Judgment is GRANTED; and

IT IS HEREBY FURTHER ORDERED that, pursuant to 28 U.S.C. § 1610(a) of the Foreign Sovereign Immunities Act, plaintiff FG Hemisphere may commence execution proceedings on the Judgment forthwith and in accordance with Rule 69 of the Federal Rules of Civil Procedure, and any applicable state laws, including but not limited to Article 52 of the New York Civil Practice Law and Rules, against the Congo and any assets, revenues or properties of the Congo used for a commercial activity in the United States (without prejudice to FG Hemisphere's right to bring a further application with respect to noncommercial assets of the Congo and against the central bank or other monetary authority of the Congo).

Dated: New York, New York
Sept. 4 , 2002

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

TOTAL P.30

# EXHIBIT 12

Critica de la Argentina

March 30, 2008

**The Funds of Santa Cruz did not return**

Jorge Lanata

[…]

"This legislature will today approve a surrendering of funds which have been privately managed abroad for many years, arbitrarily, as account figures were never provided, and we have never seen any documents in relation to it; I would dare to say that when the project was raised the majority of us here today did not see any proof of payment; on the contrary, they should have submitted, at least, documents in relation to the funds that are now abroad…they should show us something, at least".

The second chapter of the funds has more numbers but also few certainties. The file "*Kirchner Néstor and others, public administration fraud, abuse of authority, public officer's duties violation and public funds misappropriation*" was born in Buenos Aires and died in Río Gallegos in very doubtful judicial circumstances. The Judge Santiago Lozada, a person born in the Province of Córdoba, who became a Judge thanks to the Legal and Technical Secretary in office, Mr. Carlos Zanini, closed the case.

The most unusual thing about this case, apart from the fact itself, is that until today the judge's reasoning in making such a judgement is a secret. The law states that a decision which is definitive has to be made public if it is required by any citizen, but in this case Lozada decided to hide his judgment, even from the prosecutor Andrés Vivanco. When, a couple of weeks ago, the same judge archived a request from the same prosecutor, the judge transformed into a dog that bite its own tail: in the preamble of his decision he states "as I resolved before", without anyone knowing what he previously decided. A new complaint has come to join the one from the prosecutor, this one from deputy CC Patricia Bullrich, who has raised the issue with the Inter-American Commission [of Human Rights] on this subject. The second report presented by Vivanco is based on technical information provided by accountant Pisani, a minority member in the 'Story-telling' Court [the Court of Auditors], in which he requested that Néstor Kirchner, Héctor Icazuriaga, Sergio Acevedo and Carlos Sancho are investigated.

Vivanco reported, for example, several irregularities every year:

**2003:**

- US$1,174,863 missing in "income from holding bonds." Possible misappropriation of funds.

- Lack of a date in which there was a transformation of bonds into shares. Possible embezzlement.

- Lack of a date of a compulsory sale of shares for US$15,206,015. Possible embezzlement.

- The date of purchase, price and origin of the money to purchase 1,298,000 shares of YPF has not been specified. Possible embezzlement.

- Imprecision on the deposits in the investment fund Morgan Stanley in Luxembourg. Missing date, deadlines, interest, conditions. Possible misappropriation of funds, embezzlement and breach of duties.

-There is no accounting information regarding the relocation of capital to Switzerland. Possible misappropriation.

**2004:**

At the beginning of this year it was decided to concentrate 100% of the investment in the bank Credit Suisse, one half in fixed short-terms and the other half in Notes of the United States' Treasury. The accounting records were not disclosed. Possible breach of duties.

- There are no agreements attached indicating the level of costs declared.

- The portfolio adviser fees (US$214,240 dollars) reached 47.5% of the interest earned (US$451,018) in a US$50,437,321 investment. Possible embezzlement.

**2005:**

-There are no account figures for the US$38,598,000 trust, Federal Decree 393/05, "loan guarantee for the project named Construction and Installation of a production line of Clinker Cemento Pórtland in Pico Truncado".

-The difference between the declared value at the origin of the US$1,594,000 Province of Tucumán Bonds and the residual value of US$341.571, and the Condasep exchanged bonds for US$414,398 cannot be justified. Possible misappropriation.

-In respect of fiscal years 2003, 2004 and 2005, Vivanco noted that the Court of Auditors "never approved the ending balances reports prepared by the Executive Branch, on the contrary, it only certified them".

In the morning of 24 May, 2007, President Kirchner states in an interview with Magdalena Ruiz Guiñazú in Radio Continental: "The funds have already been repatriated. They are placed in the country converted in securities and bonds. I have kept them safely although I could have spent them". The version was, at least, unique: the funds remained in Switzerland, under the administration and custody of Banco Santa Cruz, in Paradeplatz 8, Zurich, *Rio Gallegos.*

**IT CAN ALL GET WORSE**

Whilst Nestor Kirchner was governor of the province, most of the funds were held under his name. After becoming President, the ownership of this deposit was transferred to the province of Santa Cruz. Since the so-called "repatriation" during Acevedo's mandate (when out of US$521 million, only US$100 million was invested in the purchase of BODEN bonds) the money was held in a trust under the name of Banco de Santa Cruz, as stated in a report presented by this bank before the Court of Auditors signed by its general manager and members of the accounting firm Pistrelli, Henry Martin y Associados. On 31 December 2006, the status of the funds was:

U.S. Treasury Notes  US$256,704,228.

U.S. Treasuries Letters US$132,883,832.

Titles of the Argentine public debt US$89,999,972.

Total in dollars, $479,592,961.

To which, US$38,888,528 should be added in several bonds (2018 Mendoza, Formosa, Par 2038, etc.).

Which makes a total amount, certified by the relevant agencies, of US$518,481,489.

Finally, last Wednesday 26 [March], in the middle of the farming crisis, governor Daniel Peralta once more announced the repatriation of the funds: US$380 million out of a non-disclosed total amount which will, it is supposed, to be brought in installments. At the end of this edition, the only account of the province in the Banco de la Nación Argentina, kept on behalf of Santa Cruz' Provincial Treasury, did not have records of any movement. The funds remain in Switzerland. The spokesman for the bank, Angel Coraggio, when asked whether or not the funds had been deposited, answered:

- The information must be provided by the governor of the province, we are not authorized. We must keep banking secrecy.

Why was the announcement made prior to the transfer? There is one possible answer; just after announcing it, the government realized a small drawback: in order for Credit Suisse to be able to transfer the money, it must be sent in US dollars to the correspondent bank of Banco de la Nación Argentino, which, in this case was to be the New York branch of the Argentine bank. Patricio Suarez Bayo, the manager in Manhattan, spent the week in direct communication with the authorities in Buenos Aires without any sleep: What would happen if the United States' Courts decide to seize the account while travelling from Zurich to Buenos Aires via New York? There is something even worse than the uncertainty of the funds, and this is the American hold-outs (bondholders who did not participate in the settlement with the Argentine government) They are claiming eleven billion dollars. The main holders are investment funds Ellis and Dart, which have claims for around US$4 and 5 billion.

The K[irchner's] government strategy to maintain in force the Economic Emergency Law is not only intended to prevent an increase in tariffs, it also allows the country to make a late payment of its debts with bondholders who were left out of the exchange and with the Paris Club creditors. American judges considered, in 2002 that Argentina was a broken country. Will they continue to do now, when the country holds US$50,500 million in reserves?



4. CRÍTICA DE LA ARGENTINA
Domingo 30 de marzo de 2008

nota de tapa

INVESTIGACIÓN:  LA CUENTA DEL BANCO NACIÓN NO

# LOS FONDOS DE SANTA

JORGE LANATA

La plata de Santa Cruz, repatriada el miércoles, nunca llegó a Buenos Aires. La cuenta de la tesorería provincial en el Banco Nación no registró movimientos, y las autoridades se desvelan por la ruta del dinero: debe pasar por la sucursal Nueva York del Nación, donde los bonistas que quedaron fuera del canje de deuda reclaman 11.000 millones. Por primera vez, un diario de alcance nacional explica: 1) cómo fue el recorrido de los fondos; 2) faltantes, imprecisiones, cobro de honorarios por el 47% de los intereses; y 3) cuántos fueron los "teóricos" mil millones: ¿1.980 o 3.520? Las cuentas básicas de una cifra misteriosa.

Esta nota es ardua. Es áspera, ilegible y tediosa. Es una nota plagada de números que serpentean, se pierden, reaparecen. Hay, en verdad, muy pocos motivos para seguir leyendo esta nota y no cambiarla, por ejemplo, por un buen cuento de Chéjov o Carver. La única razón por la cual empezamos en la lectura de esta nota tediosa es que tenga Ud. algún interés por saber qué pasó con los fondos de Santa Cruz. Es una historia de 500 millones de dólares, una cifra similar a la que cobran, por año, todos los beneficiarios del Plan Jefes de Hogar en la Argentina. O de 1.000 millones, el equivalente a 1.600.000 salarios promedio en blanco. Bastante dinero, ¿no? Bueno, muy pocas personas saben, exactamente, qué pasó con él.

### EL CORAZÓN DE LAS TINIEBLAS
En 1993 el entonces gobernador Néstor K cobró 535 millones de dólares en concepto de regalías petroleras mal liquidadas por la Nación: 320 millones en bonos y acciones de YPF y el resto en efectivo. Por consejo de Domingo Cavallo, K depositó el dinero en un banco de inversiones de Nueva York, el Dean Witter Reynolds, que se fusionaría más tarde con el Morgan Stanley. Casi todo el dinero estuvo, hasta 2001, depositado en efectivo y, a estar de los intereses de la época, podría haber generado dos tipos de rendimientos:

–"Money market": cuando es-

tá en cash y sin moverse, entre el 1,25 y el 1,75 anual.
– Plazo fijo: a tres años, por ejemplo, rendía entonces entre el 6 y el 7% anual.
La única referencia concreta al devenir del dinero durante ese período puede encontrarse en los presupuestos aprobados por la Legislatura provincial entre 1995 y 2002, cuando señala año a año los recursos provenientes de activos de la provincia en el exterior. Lo de "referencia concreta" es, en verdad, una metáfora: los legisladores levantaron la mano frente al monto total de los ingresos sin preguntar jamás qué se hizo con él. Así las cosas, se sabe que:
- 1995: (Ley 2.414) entraron 62 millones.
- 1996: (Ley 2.455) 102 millones.
- 1997: (Ley 2.478) 62 millones.
- 1998: (Ley 2.516) 65 millones.
- 1999: (Ley 2.518) 38,4 millones.
- 2000: (Ley 2.540) 145 millones.
- 2001: (Ley 2.564) 175 millones.
Para decirlo de otro modo: entre 1995 y 2001, mediante leyes del presupuesto provincial, se habilitó el ingreso de u$s649.479.591 millones.

Aquellos ocho misteriosos años, sin embargo, vieron pasar mucho más dinero: de los 535 millones iniciales, Kirchner invirtió en acciones de YPF 290 millones, comprándolas a 19 dólares cada una. En 1999 las vendió a u$s44,78 y ganó 670 millones de dólares. La suma del remanente de los 535 millones iniciales (245) más la ganancia pesenta (670) asciende a u$s915 millones.
La tasa libor (por London Interbank Offered Rate) superó



## REGISTRA EL INGRESO DE DINERO DESDE EL EXTERIOR

# CRUZ NO VOLVIERON



en aquellos años el 6% anual. Si, para calcular los intereses, se aplica esta tasa interbancaria a un promedio del 4%, se llega durante nueve años a 329.400.000 dólares, lo que sumado a los 915 millones resulta en u$s1.244.400.000 (mil doscientos cuarenta y cuatro millones cuatrocientos mil dólares). Una de las cuentas posibles, hecha por el ex senador radical Carlos Prades, agrega los intereses de aquellos años anteriores a la compra de acciones de YPF, lo que suma rendimientos por 58.800.000 dólares y eleva la suma a un total de 1.548.200.000 dólares (mil quinientos cuarenta y ocho millones doscientos mil dólares). La cifra aportada por Prades no es muy distinta de la que surge de un excelente informe publicado por el diario *Río Negro* hace algunas semanas con la firma de Javier Lojo: "Considerando un conservador índice de mercado –escribe Lojo–, la cifra puede haber llegado a 1.980 millones en un fondo de inversión. Y un hábil operador podría haber hecho trepar esa cifra hasta los u$s3.520 millones".

Fue, aquella primera, una época agitada: en 2000, Aldo Dueler, futuro ministro de Palito Ortega presidente, fue multado en Estados Unidos por lavar dinero del Cartel de Juárez. El MA Bank, su banco en las Islas Caimán (en realidad un apartado postal, el 707 West End Road) tenía unos 10 millones de dinero de los fondos de Santa Cruz. En septiembre de 2001, dos contadores de Arthur Andersen y Paget Brown, vecinos de Caimán, negociaron en el Hotel Emperador con Carlos Sánchez Herrera en nombre de Néstor Kirchner, quien reconoció que el dinero era de la Provincia. Herrera fue nombrado por K procurador general del Tesoro y renunció cuando se supo que había sido el abogado defensor de Juan Sasnián, jefe de la Policía durante la dictadura.

El atentado a las Torres Gemelas vuelve a desviar en 2001 el destino de los fondos: el dinero llegó a Europa de la mano de Alfredo McLaughlin, ex ejecutivo del Deutsche Bank, a la sucursal del Morgan Stanley en Luxemburgo. McLaughlin fue nombrado luego secretario de Finanzas de la gestión Felisa "Bolsa" Miceli, y renunció no sin antes avalar el pago del Estado al Grupo Greco.

Para Lojo, en estos años "es donde se registran las mayores pérdidas de los activos santacruceños". Según datos extraoficiales existían 720 millones a fines de 2002 en diversas cuentas suizas (que habían sido 840 millones entre 2000/2003), pero para el cierre de 2003 se informó que los activos eran de 534 millones. Trescientos seis millones menos.

Otro dato curioso: el 17 de marzo de 2003, en el mes previo a las elecciones, la provincia de Buenos Aires depositó en la cuenta del Credit Suisse 60 millones de dólares. Consultado en su momento por este equipo, Felipe Solá negó tener conocimiento del hecho.

### EL TRIBUNAL DE CUENTOS

"Esta legislatura va a terminar aprobando hoy una rendición de fondos que ha sido manejada de manera personalísima durante muchos años en el exterior, en forma arbitraria porque nunca se rindieron cuentas, donde nunca nosotros ni siquiera hemos podido ver un papel; me animaría a decir que la mayoría de los que están acá cuando se elevó este proyecto no han visto los comprobantes; de los contrario, deberían haber acompañado, por lo menos, documentación de los fondos que hoy están en el exterior... que nos muestren algo, siquiera". (Versión taquigráfica, exposición del diputado Muñiz, por la minoría, el 27 de noviembre de 2003.)

El segundo capítulo de los fondos tiene más números pero, también, pocas certezas.

El expediente "Kirchner Néstor y otros s/apología del crimen, defraudación contra la administración pública, abuso de autoridad, violación de los deberes de funcionario público y malversación de caudales públicos" nació en Buenos Aires y murió en Río Gallegos de muerte judicial dudosa. El juez Santiago Lozada, un corrubeis que llega a la Magistratura de la mano del actual secretario de Legal y Técnica, Carlos Zannini, cerró la causa. Lo apasionante del caso, mas allá del hecho en sí, es que al día de hoy los argumentos del juez para haber tomado esa decisión son secretos. La ley señala que un fallo firme debe hacerse público a requerimiento de cualquier ciudadano, pero en este caso Lozada decidió esconder su sentencia, incluso, del fiscal Andrés Vivanco. Cuando, hace algunas semanas, el mismo juez archivó un pedido del mismo fiscal, se transformó en un perro mordiéndose la cola: en los considerandos del archivo argumenta la decisión "como repleis anteriormente", sin que nadie sepa, anteriormente, qué resolvió. Al eterno reclamo del fiscal se le sumó ahora otro de la diputada por la CC Patricia Bullrich, quien también tramita una presentación ante la Comisión Interamericana. La segunda denuncia presentada por Vivanco se basa en datos técnicos aportados por el contador Pisani, vocal en minoría del Tribunal de Cuentos, en la que pidió indagatoria a Néstor Kirchner, Héctor Icazuriaga, Sergio Acevedo y Carlos Sancho. Vivanco aportó, a título de ejemplo, diversas irregularidades, año a año:

**2003:**
–Faltante de u$s1.174.863 dólares en la "renta por tenencia de bonos". Posible peculado.

–Falta de fecha en la que se concretó la transformación de bonos en acciones de YPF. Posible malversación.

–Falta de fecha de una "venta obligatoria de acciones por u$s15.206.015. Posible malversación.

–No se indica fecha de compra, precio y origen del dinero para adquirir 1.298.000 acciones de YPF. Posible malversación.

–Imprecisiones sobre depósitos en fondo de inversión Morgan Stanley en Luxemburgo. Faltan fecha, plazos, intereses, condiciones. Posible malver- ◗



sación, peculado e incumplimiento de deberes.

–No obra información contable del traslado de capitales a Suiza. Posible malversación.

**2004:**

A inicios de ese año se decidió concentrar el 100% de la inversión en el banco Crédit Suisse, la mitad en plazos fijos de corto plazo y la otra mitad en Notas del Tesoro de los Estados Unidos. Se omite presentar la registración contable. Posible incumplimiento de deberes.

–No se adjuntan contratos que indiquen el nivel de gastos declarado.

–Los honorarios del asesor de cartera (214.240 dólares) alcanzan el 47,5% de los intereses ganados (451.018 dólares) sobre una inversión de 50.437.321 dólares. Posible peculado.

**2005:**

–No hay ninguna rendición de cuentas sobre el fideicomiso de u$s38.598.000, decreto provincial 393/05, "garantía de préstamo proyecto Construcción e Instalación de una línea de fabricación de Clinker de Cemento Pórtland en Pico Truncado".

–No se puede justificar la diferencia entre el valor declarado al origen de los Bonos de la Provincia de Tucumán de u$s1.594.000 y el valor residual de u$s341.571 y los bonos canjeados Consadep por 414.398. Posible malversación.

En general y sobre los ejercicios 2003, 2004 y 2005, Vivanco observa que el Tribunal de Cuentas

"nunca aprobó los informes sobre saldos remitidos por el Poder Ejecutivo Nacional, sino que se limitó a certificar los mismos".

En la mañana del 24 de mayo de 2007, el presidente Kirchner le dice en una entrevista a Radio Continental y Magdalena Ruiz Guiñazú: "Los fondos ya están repatriados. Están en el país en títulos y bonos. Los puse a resguardo, aunque los podría haber gastado". La versión era, al menos, singular: los fondos seguían estando en Suiza, bajo la administración y custodia del Banco de Santa Cruz, en Paradeplatz 8, Zurich, Río Gallegos.

**TODO PUEDE SER PEOR**

Mientras Néstor Kirchner fue gobernador de la provincia, la mayoría de los fondos fueron depositados a su nombre. Al asumir la Presidencia de la Nación, la titularidad del depósito pasó a la provincia de Santa Cruz. Desde el gobierno de Acevedo (cuando los teóricos 521 millones sólo se trajeron 100 que se invirtieron en la compra de BODEN) el dinero estuvo en un fideicomiso a cargo del Banco de Santa Cruz, tal como consta en un informe presentado por el mismo banco ante el Tribunal de Cuentas firmado por el gerente general del estudio contable Pistrelli, Henry Martin y Asociados. La situación

de los fondos al 31 de diciembre de 2006 era:

Notas del Tesoro de EE.UU. u$s256.704.228.

Letras del Tesoro de EE.UU. u$s132.883.832.

Títulos en deuda pública argentina u$s89.999.972.

Total en dólares, u$s479.592.961.

A los que deben agregarse, en dólares, 38.888.528 en diversos bonos (Mendoza 2018, Formosa, Par 2038, etc.).

Eso da un total, certificado por los organismos competentes, de u$s518.481.489.

Finalmente, el pasado miércoles 26, en plena crisis del campo, el gobernador Daniel Peralta volvió a anunciar la repatriación de los fondos: 380 millones de dólares de un total no especificado que, se supone, se irá trayendo en cuotas. Al cierre de esta edición, la única cuenta de la provincia en el Banco Nación, a nombre de la Tesorería Provincial de Santa Cruz, no registró movimiento alguno. Los fondos siguen en Suiza. El vocero del banco, Ángel Coraggio, a la pregunta de si tenían o no depositados los fondos, respondió:

–Esa información la tienen que dar en la Gobernación de la provincia; nosotros no estamos autorizados. Debemos mantener el secreto bancario.

¿Por qué el anuncio fue anterior al traslado? Hay una respuesta posible: recién después de anunciarlo, el Gobierno advirtió un pequeño inconveniente: el Crédit

Suisse, para transferir el dinero, debe hacerlo en dólares a un banco corresponsal del Nación, en este caso la sucursal de Nueva York del banco argentino. Patricio Suárez Bayo, el gerente de carrera en Manhattan, pasó la semana en línea directa con las autoridades de Buenos Aires y sin conciliar el sueño: ¿qué pasa si la Justicia norteamericana decide embargar la cuenta mientras el dinero viaja desde Zurich a Buenos Aires vía Nueva York? Hay algo por qué la incertidumbre de los fondos, y son los hold outs norteamericanos, los bonistas que quedaron fuera del arreglo con el gobierno argentino. Reclaman once mil millones de dólares. Los tenedores principales son los fondos de inversión Ellis y Dart, que accionaron legalmente solicitando la devolución de una cifra de entre 4 y 5 mil millones.

La estrategia del gobierno K de mantener en vigencia constante la Ley de Emergencia Económica no refiere sólo a evitar el aumento de tarifas; también permite eludir el que el país pueda pagar sus deudas con retraso con los bonistas que quedaron fuera del canje y con los acreedores del Club de París. Los jueces norteamericanos consideraban, en 2002, a la Argentina como un país quebrado. ¿Lo seguirán haciendo ahora, con 50.500 millones de dólares de reservas?

**INVESTIGACIÓN: J.L./LUCIANA GEUNA/JESICA BOSSI**

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
CMS GAS TRANSMISSION COMPANY,          :
                                       :
                                       :          08 Civ. 3169 (LAP)
                    Petitioner,         :
                                       :
           - against –                  :
                                       :
THE REPUBLIC OF ARGENTINA,              :
                                       :
                    Respondent.         :
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INFORMATION SUBPOENA

To:    Ms. Susan M. Steffen
       Vice President
       Credit Suisse
       One Madison Avenue
       New York, NY  10010

***CMS Gas Transmission Company v. Argentine Republic*** (Case No. ARB/01/8)

WHEREAS, we represent CMS Gas Transmission Company (***CMS***), and,

WHEREAS, in connection with our enforcement of the arbitral award for US$133.2 million plus interest (now totaling over US$168 million) issued in *CMS Gas Transmission Company v. Argentine Republic* (Case No. ARB/01/8) (the ***Award***) on May 12, 2005 (decision denying annulment issued on September 25, 2007) following an arbitration conducted in Washington, D.C., under the rules of the International Centre for the Settlement of Investment Disputes, we note that 22 U.S.C. §1650a provides that "[a]n award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." Thus, under U.S. law, the Award carries the same weight as a judgment of the New York Supreme Court, and CMS is a judgment creditor, and,

WHEREAS, Federal Rule of Civil Procedure 69 provides that state law – in this case New York law – governs the procedure for proceedings to execute a judgment. Under New York Civil Practice Law and Rules (***CPLR***) §5223:

At any time before a judgment is satisfied or vacated, the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena, which shall specify all of the parties to the action, the date of the judgment, the court in which it was entered, the amount of the judgment and the amount then due thereon, and shall state that false swearing or failure to comply with the subpoena is punishable as a contempt of court.

NOW, THEREFORE, WE COMMAND YOU, pursuant to CPLR §5223, as representatives of a judgment creditor, CMS, in order that CMS may collect and to compel the Republic of Argentina to satisfy the Award, to make answer to the within questions in writing under oath and return the original of the questions together with your answers to the undersigned in the prepaid addressed return envelope accompanying this subpoena within seven days of their receipt.

TAKE NOTICE THAT false swearing or failure to comply with this subpoena is punishable as a contempt of court.

I hereby certify that this information subpoena complies with Rule 5224 of the Civil Practice Law and Rules and that I have a reasonable belief that the party receiving this subpoena has in their possession information about the debtor that will assist the creditor in collecting the judgment.

Date: April 2, 2008

Signed: _____
Alexander A. Yanos

Freshfields Bruckhaus Deringer LLP
520 Madison Ave., 34th Floor
New York, New York 10022

T: (212) 284-4918
F: (212) 277-4001

*Attorneys for CMS Gas Transmission Company*

## QUESTIONS MADE TO THE WITHIN SUBPOENA

Q.

Please disclose all information in your possession, custody or control relating to the existence, location, status, nature, transfer, withdrawal, assignment and/or removal of any funds currently or within the past one month held in an account at Credit Suisse (including all of its affiliates, subsidiaries or parent entities) by or on behalf of the Argentine Province of Santa Cruz or the Republic of Argentina or any province, division, state, agency or instrumentality thereof.

Q.

Please disclose all information in your possession, custody or control regarding any commercial assets (including but not limited to bank accounts and securities) located in the United States that are owned by or held on behalf of the Republic of Argentina or any province, division, state, agency or instrumentality thereof, including the Province of Santa Cruz and Banco de la Nación Argentina. This information should be provided in a list documenting the type of asset, location, and other relevant identifying information.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

CMS GAS TRANSMISSION COMPANY,   :

    :         08 Civ. 3169 (LAP)

Petitioner,   :

    :

- against –   :

    :

THE REPUBLIC OF ARGENTINA,   :

    :

Respondent.   :

    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INFORMATION SUBPOENA

To:   Mr. H.E. Osvaldo César Guglielmino
       Procurador del Tesoro de la Nación
       Procuración del Tesor de la Nación
       Posadas 1641
       CP 1112 Buenos Aires
       Argentina

***CMS Gas Transmission Company v. Argentine Republic*** (Case No. ARB/01/8)

WHEREAS, we represent CMS Gas Transmission Company (***CMS***), and,

WHEREAS, in connection with our enforcement of the arbitral award for US$133.2 million plus interest (now totaling over US$168 million) issued in *CMS Gas Transmission Company v. Argentine Republic* (Case No. ARB/01/8) (the ***Award***) on May 12, 2005 (decision denying annulment issued on September 25, 2007) following an arbitration conducted in Washington, D.C., under the rules of the International Centre for the Settlement of Investment Disputes, we note that 22 U.S.C. §1650a provides that "[a]n award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." Thus, under U.S. law, the Award carries the same weight as a judgment of the New York Supreme Court, and CMS is a judgment creditor, and,

WHEREAS, Federal Rule of Civil Procedure 69 provides that state law – in this case New York law – governs the procedure for proceedings to execute a judgment. Under New York Civil Practice Law and Rules (***CPLR***) §5223:

At any time before a judgment is satisfied or vacated, the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena, which shall specify all of the parties to the action, the date of the judgment, the court in which it was entered, the amount of the judgment and the amount then due thereon, and shall state that false swearing or failure to comply with the subpoena is punishable as a contempt of court.

NOW, THEREFORE, WE COMMAND YOU, pursuant to CPLR §5223, as representatives of a judgment creditor, CMS, in order that CMS may collect and to compel the Republic of Argentina to satisfy the Award, to make answer to the within questions in writing under oath and return the original of the questions together with your answers to the undersigned in the prepaid addressed return envelope accompanying this subpoena within seven days of their receipt.

TAKE NOTICE THAT false swearing or failure to comply with this subpoena is punishable as a contempt of court.


Date: April 2, 2008


Signed: _____
Alexander A. Yanos

Freshfields Bruckhaus Deringer LLP
520 Madison Ave., 34th Floor
New York, New York 10022

T: (212) 284-4918
F: (212) 277-4001

*Attorneys for CMS Gas Transmission Company*

## QUESTIONS MADE TO THE WITHIN SUBPOENA

Q.
Please disclose all information in your possession, custody or control relating to the existence, location, status, nature, transfer, withdrawal, assignment and/or removal of any funds currently or within the past one month held in an account at Credit Suisse (including all of its affiliates, subsidiaries or parent entities) by or on behalf of the Argentine Province of Santa Cruz or the Republic of Argentina or any province, division, state, agency or instrumentality thereof.

Q.
Please disclose all information in your possession, custody or control regarding any commercial assets (including but not limited to bank accounts and securities) located in the United States that are owned by or held on behalf of the Republic of Argentina or any province, division, state, agency or instrumentality thereof, including the Province of Santa Cruz and Banco de la Nación Argentina.  This information should be provided in a list documenting the type of asset, location, and other relevant identifying information.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CMS GAS TRANSMISSION COMPANY,     :
                                  :
                                  :          08 Civ. 3169 (LAP)
            Petitioner,           :
                                  :
        - against –               :
                                  :
THE REPUBLIC OF ARGENTINA,        :
                                  :
            Respondent.           :
                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SUBPOENA FOR TAKING DEPOSITION AND SUBPOENA DUCES TUCEM**

To:    Mr. Patricio Suarez Buyo
       General Manager
       Banco de la Nación Argentina
       225 Park Avenue, 3rd Floor
       New York, NY  10169


***CMS Gas Transmission Company v. Argentine Republic*** (Case No. ARB/01/8)

WHEREAS, we represent CMS Gas Transmission Company (***CMS***), and,

WHEREAS, in connection with our enforcement of the arbitral award for US$133.2 million plus interest (now totaling over US$168 million) issued in *CMS Gas Transmission Company v. Argentine Republic* (Case No. ARB/01/8) (the ***Award***) on May 12, 2005 (decision denying annulment issued on September 25, 2007) following an arbitration conducted in Washington, D.C., under the rules of the International Centre for the Settlement of Investment Disputes, we note that 22 U.S.C. §1650a provides that "[a]n award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  Thus, under U.S. law, the Award carries the same weight as a judgment of the New York Supreme Court, and CMS is a judgment creditor, and,

WHEREAS, Federal Rule of Civil Procedure 69 provides that state law – in this case New York law – governs the procedure for proceedings to execute a judgment.  Under New York Civil Practice Law and Rules (***CPLR***) §5223:

At any time before a judgment is satisfied or vacated, the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena, which shall specify all of the parties to the action, the date of the judgment, the court in which it was entered, the amount of the judgment and the amount then due thereon, and shall state that false swearing or failure to comply with the subpoena is punishable as a contempt of court.

NOW, THEREFORE, WE COMMAND YOU, pursuant to CPLR §5223, as representatives of a judgment creditor, CMS, in order that CMS may collect and to compel the Republic of Argentina to satisfy the Award, to appear and attend at the offices of Freshfields Bruckhaus Deringer LLP at 520 Madison Avenue, 34th Floor, New York, New York, 10022, on April 14, 2008 at 2:00 p.m. to be examined under oath concerning all matters relevant to the satisfaction of the Award.

WE FURTHER COMMAND YOU, to produce for examination at the time and place indicated above certain books, papers, and records, to wit: all documents relevant to the questions appended to the Information Subpoena served on Banco de la Nación Argentina on today's date.

TAKE NOTICE THAT false swearing or failure to comply with this subpoena is punishable as a contempt of court.

Date: April 2, 2008

Signed: _____
         Alexander A. Yanos

Freshfields Bruckhaus Deringer LLP
520 Madison Ave., 34th Floor
New York, New York 10022

T: (212) 284-4918
F: (212) 277-4001

*Attorneys for CMS Gas Transmission Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
CMS GAS TRANSMISSION COMPANY,                  :
                                               :
                                               :          08 Civ. 3169 (LAP)
                  Petitioner,                  :
                                               :
        - against –                            :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                  Respondent.                  :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INFORMATION SUBPOENA

To:    Mr. Patricio Suarez Buyo
       General Manager
       Banco de la Nación Argentina
       225 Park Avenue, 3rd Floor
       New York, NY  10169

***CMS Gas Transmission Company v. Argentine Republic*** (Case No. ARB/01/8)

WHEREAS, we represent CMS Gas Transmission Company (***CMS***), and,

WHEREAS, in connection with our enforcement of the arbitral award for US$133.2 million plus interest (now totaling over US$168 million) issued in *CMS Gas Transmission Company v. Argentine Republic* (Case No. ARB/01/8) (the ***Award***) on May 12, 2005 (decision denying annulment issued on September 25, 2007) following an arbitration conducted in Washington, D.C., under the rules of the International Centre for the Settlement of Investment Disputes, we note that 22 U.S.C. §1650a provides that "[a]n award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  Thus, under U.S. law, the Award carries the same weight as a judgment of the New York Supreme Court, and CMS is a judgment creditor, and,

WHEREAS, Federal Rule of Civil Procedure 69 provides that state law – in this case New York law – governs the procedure for proceedings to execute a judgment.  Under New York Civil Practice Law and Rules (***CPLR***) §5223:

At any time before a judgment is satisfied or vacated, the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena, which shall specify all of the parties to the action, the date of the judgment, the court in which it was entered, the amount of the judgment and the amount then due thereon, and shall state that false swearing or failure to comply with the subpoena is punishable as a contempt of court.

NOW, THEREFORE, WE COMMAND YOU, pursuant to CPLR §5223, as representatives of a judgment creditor, CMS, in order that CMS may collect and to compel the Republic of Argentina to satisfy the Award, to make answer to the within questions in writing under oath and return the original of the questions together with your answers to the undersigned in the prepaid addressed return envelope accompanying this subpoena within seven days of their receipt.

TAKE NOTICE THAT false swearing or failure to comply with this subpoena is punishable as a contempt of court.

I hereby certify that this information subpoena complies with Rule 5224 of the Civil Practice Law and Rules and that I have a reasonable belief that the party receiving this subpoena has in their possession information about the debtor that will assist the creditor in collecting the judgment.

Date: April 2, 2008

Signed: _____

Alexander A. Yanos

Freshfields Bruckhaus Deringer LLP
520 Madison Ave., 34th Floor
New York, New York 10022

T: (212) 284-4918
F: (212) 277-4001

*Attorneys for CMS Gas Transmission Company*

## QUESTIONS MADE TO THE WITHIN SUBPOENA

Q.
Please disclose all information in your possession, custody or control relating to the existence, location, status, nature, transfer, withdrawal, assignment and/or removal of any funds currently or within the past one month held in an account at Credit Suisse (including all of its affiliates, subsidiaries or parent entities) by or on behalf of the Argentine Province of Santa Cruz or the Republic of Argentina or any province, division, state, agency or instrumentality thereof.

Q.
Please disclose all information in your possession, custody or control regarding any commercial assets (including but not limited to bank accounts and securities) located in the United States that are owned by or held on behalf of the Republic of Argentina or any province, division, state, agency or instrumentality thereof, including the Province of Santa Cruz and Banco de la Nación Argentina.  This information should be provided in a list documenting the type of asset, location, and other relevant identifying information.